MICHAEL J. REISER, ESQ. (Bar No. 133621)
MATTHEW REISER, ESQ. (Bar No. 315301)
ISABELLA MARTINEZ, ESQ. (Bar No. 315299)
MICHAEL REISER, ESQ. (Bar. No. 320452)
REISER LAW, p.c.
1475 N. Broadway, Suite 300
Walnut Creek, California 94596
Telephone: (925) 256-0400

TYLER MEADE, ESQ. (Bar No. 160838)
ANNIE DECKER, ESQ. (Bar No. 268435)
SAM FERGUSON, ESQ. (Bar No. 270957)
THE MEADE FIRM p.c.
12 Funston Ave., Suite A
San Francisco, CA 94129
Telephone: (415) 724-9600

Attorneys for Plaintiffs, Dean and
Laurie Beaver

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEAN BEAVER and LAURIE BEAVER, <br><br> Plaintiffs, <br><br> v. <br><br> OMNI HOTELS MANAGEMENT CORPORATION, a Delaware Corporation; LC BROKERAGE CORP., a Delaware Corporation; LC INVESTMENT 2010, LLC, a Delaware Limited Liability Company; WILLIAM IMS, an individual; KELLY GINSBERG, an individual; BRETT ALEXANDER COMBS, an individual; and DOES 1 through 50, inclusive. | Case No. **'20CV0191 AJB KSC** <br><br> **CLASS ACTION COMPLAINT:** <br><br> 1. **BREACH OF CONTRACT** <br> 2. **INTERNTIONAL INTERFERENCE WITH CONTRACT** <br> 3. **BREACH OF FIDUCIARY DUTY** <br> 4. **AIDING AND ABETTING BREACH OF FIDUCIARY DUTY** <br> 5. **VIOLATIONS OF BUS. & PROF. CODE §17200 *ET SEQ*. (UCL)** <br> 6. **VIOLATIONS OF 18 U.S.C. §1962(c)** <br> 7. **VIOLATIONS OF 18 U.S.C. §1962(d)** <br> 8. **DECLARATORY RELIEF (UMA)** <br> 9. **UNJUST ENRICHMENT** <br> 10. **ACCOUNTING** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Dean Beaver and Laurie Beaver, on behalf of themselves and all others similarly situated (the "Class"), bring this action against Omni Hotels Management Corporation, LC Brokerage Corp., LC Investment 2010, LLC, Kelly Ginsberg, William Ims, and Brett Alexander Combs (collectively, "Defendants") based upon the investigation of counsel and information and belief:

## INTRODUCTION

1.      The Omni La Costa Resort and Spa ("La Costa" or "Resort") is a world-renowned resort in Carlsbad, California, just north of San Diego. It boasts over 400 acres of luscious grounds in a semi-tropical California paradise. The grounds include two championship golf courses and a top-flight wellness spa.

2.      It has a storied and sometimes sordid history. For years, it has been a hangout for celebrities and other infamous individuals. During the Watergate scandal, for instance, President Richard Nixon's aides used the Resort as a retreat to map their political strategy.[1]

3.      This case involves a more recent string of nefarious wrongdoing — the years-long scheme by Defendant Omni Hotels Management Corporation ("Omni") and the other Defendants named herein to bilk Plaintiffs and the Class of millions of dollars.

4.      In the mid-2000s, the prior owner of the Resort developed and sold 137 "villas." The villas are vacation-ownership properties, known as "condo hotels" or "condotels."

5.      The villas are like hotel rooms. They are located on the grounds of the Resort, they are keyed through a central access system controlled and maintained by Omni, and they have room numbers like all other hotel rooms. The difference

---

[1] *See* The Case of Moe Dalitz's Bad Press, *Rolling Stone*, February 12, 1976, available at https://www.rollingstone.com/culture/culture-news/the-case-of-moe-dalitzs-bad-press-63017/.

with other hotel rooms is that Plaintiffs' and Class members' villas are individually owned by Plaintiffs and the Class in fee simple.

6.    The Declaration of Covenants, Conditions and Restrictions ("CCRs") that govern the villas, as well as local Carlsbad zoning laws, prohibit villa owners from using their villas for more than 120 days per year.

7.    Because of the use restriction, owners are effectively forced to rent their villas for two-thirds of the year or leave them unoccupied.

8.    Dean and Laurie Beaver, husband and wife who jointly own unit 52,[2] rented their villa pursuant to the terms of a "Rental Management Agreement" ("RMA") with Defendant LC Brokerage, an affiliate of Omni. Like the overwhelming majority of villa owners (approximately 98%), the Beavers rent their unit under the RMA near full time and do not use anywhere close to the 120 days they are permitted to use for personal use.[3]

9.    The core of this case involves Omni's years-long scheme to self-deal through tortious and fraudulent interference with and management of the villa rental program under the RMA. While LC Brokerage is ostensibly charged with operating the rental program, in practice LC Brokerage has no control over or involvement with it. Rather, Omni controls the rental program, which it operates to intentionally steer guests into its own hotel rooms rather than the villas, a blatant breach of fiduciary duties. Omni and the other Defendants named herein have perpetrated this RICO scheme to defraud by using LC Brokerage as an enterprise.

10.    Plaintiffs bring this case to recoup tens of millions of dollars the Class has been denied — and which has been steered to Defendants' benefit — as a

---

[2] On the Beavers' deed, the unit is listed as number 52. Omni uses alternative numeration to distinguish rooms at the Resort. Under Omni's system, the Beavers' unit is hotel unit 6547.

[3] In fact, the Beavers did not stay in their villa at all in 2019. In 2018, they used just 16 nights for themselves and their guests; in 2017, they used just 15 nights for themselves and their guests; and in 2016, they used just 9 nights for themselves and their guests.

result of Omni's abuse of the rental program and utilization of strong-arm tactics that effectively force villa owners to use Omni's intentionally mismanaged program.

11.     Plaintiffs seek disgorgement of Defendants' ill-gotten profits from this abuse and self-dealing, including disgorgement of all management fees paid to LC Brokerage and Omni, as well as the increased profits Omni receives by steering customers into its own hotel rooms. Plaintiffs also seek damages for the diminution in value of their villas, which now sell substantially below what they should as a result of the poor rental returns caused by Omni. Plaintiffs also seek to recover their costs of suit and attorneys' fees pursuant to a contractual right to such fees under the RMA.

12.     Plaintiffs finally seek declaratory relief pursuant to the Unit Maintenance and Operations Agreement ("UMA"), a separate agreement that owners must sign upon purchase. The UMA requires Plaintiffs to pay $100/night *or* 20% of their rental revenue, whichever is greater, to Defendant LC Investment 2010, if they opt to rent their units outside of the RMA. Plaintiffs seek a declaration that their rental guests under the UMA are entitled to use Resort amenities on the same terms and conditions as guests under the RMA.

## PLAINTIFFS

13.     Plaintiffs Dean and Laurie Beaver are individual residents of California and a married couple. They jointly own unit 52 at the Resort as joint tenants.

## DEFENDANTS

14.     Defendant LC Investment 2010, LLC, is a Delaware limited liability company. Plaintiffs believe and allege that it is the fee simple owner of the Omni La Costa Resort & Spa. It is the counterparty and/or successor-in-interest to the UMA signed by villa owners upon acquisition of their interest in a villa.

15. Defendant Omni Hotels Management Corporation is a Delaware corporation and is the manager of the Omni La Costa Resort and Spa, pursuant to a Management Agreement with Defendant LC Investment 2010, LLC dated July 1, 2013.

16. Defendant LC Brokerage Corp., d/b/a La Costa Resort Real Estate, is a Delaware corporation. It is a California-licensed real estate brokerage company, license number 01879925. LC Brokerage is the counterparty to villa owners under the RMA. Pursuant to that agreement, LC Brokerage was appointed as the exclusive rental and management agent to run the villa rental program on behalf of Plaintiffs and the Class. Until approximately August 2017, LC Brokerage operated from offices on the grounds of the Resort. In approximately August 2017, it closed its offices and ceased operations, though it still maintains its license. LC Brokerage never disclosed to villa owners that it ceased operations.

17. Defendant Kelly Ginsberg is a California licensed real estate broker, license number 01305825. She was the broker-of-record for LC Brokerage from April 2012 until March 2015.

18. Defendant William Ims is a California licensed real estate broker, license number 00401743. He was the broker-of-record for LC Brokerage from March 2015 until December 2017, during which time LC Brokerage ceased operations.

19. Defendant Brett Alexander Combs is a California licensed real estate broker, license number 01347012. He is the current broker-of-record for LC Brokerage. He is also a broker for P.S. Platinum Real Estate, which moved into LC Brokerage's former offices on the grounds of the Resort.

20. The true names and capacities of the Defendants Does 1 through 50, whether individual, corporate, associate or otherwise, are unknown to Plaintiffs at the time of filing this Complaint and Plaintiffs, therefore, sue said Defendants by such fictitious names and will ask leave of court to amend this Complaint to show

their true names or capacities when the same have been ascertained. Plaintiffs are informed and believe, and therefore allege, that each of the Doe Defendants is, in some manner, responsible for the events and happenings herein set forth and proximately caused injury and damages to the Plaintiffs as herein alleged.  All references to "Defendants" in this Class Action Complaint include the DOE Defendants.

## JURISDICTION AND VENUE

21.     Jurisdiction is proper under 28 U.S.C. § 1332(d), the Class Action Fairness Act, because there is partial diversity (at least one Class member is a citizen of a different state than one defendant) and because the amount in controversy exceeds $5 million.

22.     In the alternative, jurisdiction is also proper under 28 U.S.C. § 1331 as a civil action arising under the laws of the United States.

23.     Venue is proper in the Southern District of California under 28 U.S.C. § 1391(b)(2) as a substantial part of the events and omissions giving rise to this action occurred in Carlsbad, California, located within the Southern District.

## COMMON ALLEGATIONS

24.     The Resort has approximately 600 rooms, 137 of which are "villas" owned in fee simple by parties other than the Resort and its affiliates. The villas are vacation-rental properties. Pursuant to the CCRs and local Carlsbad zoning ordinances, villa owners may occupy their villas up to 120 days a year. The remainder of the year, they may rent their villas or leave them empty.

25.     Approximately 98% of villa owners rent through a program run by Defendant LC Brokerage. The rental program is governed the RMA, a form agreement. An exemplary copy of the form RMA is attached to the Complaint as Exhibit 1.

26.     Pursuant to the terms of the form RMA, LC Brokerage acts as villa owners' "exclusive rental agent" with the "sole authority" to set rental rates for

villas and rent villas as part of a larger "rental program." LC Brokerage is tasked with day-to-day rental management of the villas — including advertising, rental brokerage services, cleaning, maintenance and accounting. Specifically, LC Brokerage is required to: (1) set rental rates, Ex. 1 ¶ I.3; (2) act as the villa owners' exclusive rental agent, Ex. 1 ¶ I.4; (3) collect rent Ex. 1 ¶ I.6; and (4) account for revenues and expenditures, Ex. 1 ¶ I.7.

27.    Critically, LC Brokerage is also required to "maximize" revenues on behalf of villa owners. Ex. 1 ¶ I.3.

28.    In exchange, LC Brokerage is entitled to 50% of a villa owners' rental revenue. Ex. 1 ¶ III.1. LC Brokerage also charges an additional 6.7% for credit card and travel agent fees, which are charged on the gross rental revenue, and retained by LC Brokerage, regardless of whether such fees are actually incurred. Ex. 1, ¶ III.2.

29.    The RMA is silent as to whether guests are granted access to the Resort's amenities during their stay. As a matter of practice, Omni has granted guests access to resort amenities, including the Resort pools and Kidtopia, a child's playground at the resort. *See generally* Ex. 1.

30.    Omni itself was *not* charged with running and overseeing the rental program. *See* Ex. 1 ¶ II.1 ("Employment. Agent [LC Brokerage] shall retain, hire, supervise and discharge all labor and employees required for the rental of the Property.") The rental program was given to LC Brokerage rather than Omni to guard against the inherent conflict-of-interest between Omni's incentive to rent its own hotel rooms — where Omni collects *all* of the revenue — before renting villas, where Omni collects only a share of the revenue. LC Brokerage, rather than Omni, was also appointed because rental management requires a real estate license; LC Brokerage has such a license, while Omni does not.

31.    While the RMA contemplates that LC Brokerage may use Omni's services and personnel to facilitate the rental program (such as using Omni

employees for check-in and check-out, maintenance and cleaning), Ex. 1 ¶ II.1, the RMA does not contemplate that LC Brokerage may abdicate its responsibility under the RMA to Omni unsupervised.

32.    As a licensed real estate brokerage company, and by undertaking to manage villas on behalf of villa owners, LC Brokerage owed fiduciary duties of loyalty and candor to villa owners with respect to its rental management.[4]

33.    However, LC Brokerage flagrantly violated these obligations. Instead of acting as an exclusive rental agent, LC Brokerage quietly abdicated all of its management responsibility under the RMA to Omni, which exercises exclusive control over the villa rental program in a scheme to self-deal.

34.    Contrary to the express terms of the RMA, which requires LC Brokerage to (at minimum) "supervise" all rental management personnel, Ex. 1 ¶ II.1, Omni has used LC Brokerage as a RICO enterprise in a scheme to self-deal. LC Brokerage's brokers of record — Defendants Ginsberg, Ims and Combs — have facilitated this scheme by acting as registered licensed brokers for LC Brokerage while doing nothing to ensure proper supervision of the rental program.

35.    Defendants Ginsberg, Ims and Combs were and are aware that LC Brokerage is obligated to administer the rental program — indeed, the RMA is typically signed by villa purchasers alongside purchase documents at closing, where these brokers of record have been present as representatives of villa buyers and sellers (or both). However, they have done nothing to ensure LC Brokerage's compliance with the RMA.

---

[4] *See, e.g.*, Cal. Bus. & Prof. Code § 10131(b) (defining a real estate broker as one who leases or rents property on behalf of another for consideration); *In re Niles*, 106 F.3d 1456, 1459 (noting real estate agent who managed property and collected rent on behalf of another was a fiduciary) (9th Cir. 1997); *Reiser v. Marriot*, 2017 WL 569677 (E.D. Cal. Feb. 13, 2017) (noting fiduciary duties of timeshare management company stemming from control over individually-deeded property); *William L. Lyon & Associates, Inc. v. Superior Court*, 204 Cal.App.4th 1294, 1311 (2012) (noting fiduciary obligations of real estate agents); *Roberts v. Lomato*, 112 Cal.App.4th 1553 (2003) (same).

36.     LC Brokerage does not supervise the rental program to ensure it is run for villa owners' benefit, despite fiduciary and contractual obligations to do so. Indeed, Defendants Ginsberg and Ims have both admitted under oath that LC Brokerage has never supervised or administered the rental program. Instead, both of these brokers testified that Omni has always administered and controlled the rental program with no supervision by LC Brokerage. Indeed, Ginsberg and Ims have both conceded that they knew at the time that buyers signed the RMA that LC Brokerage would have no responsibility for the rental program, but never disclosed such a fact to buyers.

37.     With Omni in control — and no licensed real estate manager protecting villa owners' interests — Omni manages villa rentals for its own benefit.

38.     Omni intentionally overprices the villas in order to steer customers into its own hotel rooms.

39.     For instance, suites — which have a minimum size of 650 square feet — can be routinely booked on Omni's website for $450 per night or less. The starting price of the villas, by contrast, is typically nearly double, even though the lowest-category villa is only 625 square feet.

40.     Omni also purposefully *undersells* the villas. It uses evocative language to describe its own rooms, but lackluster and dull language to describe the villas.

41.     When potential guests visit the Omni La Costa Resort website they are presented with these competing descriptions of the similarly-sized La Costa Suites (owned by Omni) and Villa Bedrooms (owned by Plaintiffs and Class members):

**La Costa Suites**
These elegant suites blend beauty, comfort and some of our best views. Relax in a spacious sitting area with a queen-sized sofa bed and stylish conveniences to keep you entertained and connected. The separate bedroom

includes a luxurious king bed and the marble bathroom features an oversized soaking tub, separate shower and dual vanities. 650 square feet.

**Villa Bedroom**
Villa Bedrooms are available with one king bed or two queen beds and includes a mini refrigerator. Villa Bedrooms do not include a kitchen or a separate living room. 625 square feet.

42.     While villa bedrooms are substantially similar to hotel suites, they are marketed to the general public at approximately twice the retail starting price of the hotel's suites. With these two options, guests almost never book the villas as they can reserve a comparable product at nearly half the price from Omni's own inventory.

43.     Omni also routinely changes the price of its own hotel rooms to account for supply and demand, using "dynamic pricing" generated through complex algorithms and computer models. By contrast, the prices Omni sets for the villas remain essentially static.

44.     The following graph illustrates Omni's pricing approach:



45.     The top line represents the lowest retail offering price of villas on Omni's website on June 5, 2019 for the next five months, which fluctuate between $709/night and $769/night.

46.     All other lines represent the lowest retail starting price of Omni's own rooms on its website by category.

47.     The top line remains virtually static and priced well above all the other categories of rooms. By contrast, the lines reflecting Omni's own rooms fluctuate dramatically in response to supply and demand, sometimes even crossing the prices of their own rooms.

48.     Omni's decision to overprice and undersell the villas has satisfied two objectives.

49.     First, by overpricing the villas, Omni has steered paying customers into its own hotel rooms, where it collects 100% of the revenue, rather than the villas, where it collects only 50%.

50.     Second, by overpricing the villas, Omni leverages the empty villa inventory to accommodate overflow guests and large corporate groups which Omni could not host without the extra swing inventory. These group bookings are a major part of Omni's business strategy at La Costa; group bookings make up 50-60% of the Resort's bookings according to the sworn testimony of Greg Dutton, the Resort's former Director of Finance. Keeping the villas empty in reserve enables Omni to utilize a block of inventory (the villas) without significant capital investment or routine upkeep, as these costs are borne by villa owners.

51.     As a consequence, villa owners are denied significant rental revenues.

52.     Villas are rarely — if ever — booked at rates offered to retail customers on Omni's website. Instead, the villas are almost exclusively filled with discounted-rate guests and discounted group booking guests. Omni treats the villas as the hotel's overflow inventory to be used when hotel accommodations are not otherwise available.

53.     The numbers speak for themselves. The combined occupancy rate of the hotel (both hotel rooms and villas) from 2015 to the present has hovered around 67%, yet the villas are typically occupied between 35% and 45% (depending on category of room) on an annual basis. This is almost *half* of the occupancy rate of the hotel rooms on their own.

54.     The average revenue for a nightly booking at the hotel (including hotel rooms and villas) is approximately $275 per night, but the average revenue for a nightly booking in most categories of villa is about $200 per night — despite the villas' being marketed at starting prices of $700 per night or more.

55.     The "RevPAR" (Revenue Per Available Room Night, a standard metric in the hospitality industry) of hotel rooms is also considerably higher than the villas, even though the hotel rooms are typically marketed at lower starting prices and theoretically should generate *less* income than the villas.

56.     Without Omni's intentional interference and with better yield management, Plaintiffs' net revenue would have been substantially greater.

57.     The Beavers' occupancy and revenue figures are illustrative of the flagrant mismanagement of the villas:

**Occupancy:**

• In 2019, the Beavers' occupancy rate was just **20.82%** — less than a third of the average occupancy rate at the Resort. They had rental guests in their villa just 76 of 337 available nights. (The villa was out of order for 28 nights.) The Beavers never used their villa for their own purposes in 2019.

• In 2018, the Beavers' occupancy rate 34.25%. That figure includes the 16 nights the Beavers used their villa for their own purposes. Discounting personal use nights, the Beavers' occupancy rate was 31.87%.

• In 2017, the Beavers' occupancy rate was 41.37%, a figure that includes 15 nights that the Beavers used the villa for their own purposes.

**Revenue:**

• In 2019, the Beavers netted just $8,561.60 from rental of their villa, or approximately $713.47 per month. Omni advertises the Beavers' unit at $709/night or more, meaning that the Beavers received revenue accounting for just over two bookings per month if the villa were ever booked at advertised prices.

• After discounting HOA fees, the Beavers netted approximately $6,000 during 2019.

• In 2019, the highest nightly rate to book the Beavers villa was $449 — substantially less than the $709 or more at which the villa is advertised. This means the villa was never booked at advertised rates. Most of the Beavers' bookings were in the $200-275 range, and one nightly rental was as low as $100.

• In 2019, RevPAR in the Beavers' villa was $58.67.

• In 2019, 22 of the 25 bookings in the Beavers' villa were made under the booking code "VGCORP" or "GCORP," meaning they were group corporate bookings at substantially discounted rates. The three remaining bookings were under codes VNETNOP, VPACK and GNATL, which are also discounted bookings. There was not a single retail booking in the Beavers' villa during 2019.

• In 2018, the Beavers netted $14,052.56 from rental of their villa, or approximately $1,171.05 per month.

• After discounting HOA fees, the Beavers netted approximately $11,000 during 2018.

• In 2018, the Beavers had just two bookings over $600/night. The remainder of their bookings were discounted rates, generally in the $200-275/night range.

• In 2018, the RevPAR in the Beavers' villa was $90.65.

• Though the economy and the vacation industry have reached new highs in recent years, and revenue at La Costa has increased, the revenue from the Beavers' villa has been steadily falling since 2016. ($19,557.62 in rental income in 2016; $17,989.41 in 2017; $14,052.56 in 2016; and $8,561.60 in 2019.) In fact, the Beavers revenue declined by 56.22% between 2016 and 2019.

58.     Omni's abuse of the villa rental program was intentionally concealed from villa owners. It was only in October 2017 that Plaintiffs began to suspect that Omni was running the rental program as an "overflow" program, rather than an independent rental program to drive returns for Plaintiffs and the Class. In an email exchange with Gary Sims, the then-managing director of the Resort and an Omni employee (and *not* an employee or agent of LC Brokerage), Sims accidentally disclosed to Dean Beaver that the villa rental program was an "overflow" program. Sims told Dean Beaver that "The RMA document outlines the rules and regulations of having your unit in our rental pool and clearly defines the parameters that we use to allow any unit to be used as *overflow inventory for our Resort*" (emphasis added). This characterization of the villas as "overflow inventory" was a shock to the Beavers and contrary to the express terms of RMA. Prior to Sims's email, the Beavers believed LC Brokerage was running a legitimate rental program on their behalf, with Omni's assistance.

59.     Sims continued that "we want to keep ALL of the villas in *our* rental pool as it is very valuable *to us* during *our* peak times and helps *us* book larger groups year round," (capitalization in original, italics added) making clear that Sims believed the rental pool was designed to improve Omni's bottom line.

60. Critically, Omni did not act alone in this scheme to self-deal.

61. First, Omni could not have unjustly profited without LC Brokerage intentionally abandoning its obligations to villa owners. At no point did LC Brokerage or any of its successive brokers of record (Defendants Ginsberg, Ims and Combs) disclose to villa owners that Omni was in full control of the rental program with no oversight or independent management by LC Brokerage. LC Brokerage and Defendants Ginsberg, Ims and Combs also never disclosed that Omni was running an *overflow* program rather than a rental program as contemplated under the RMA.

62. Second, LC Brokerage's successive brokers of record enabled this scheme by lending their licenses to LC Brokerage in order to establish a separate licensed entity to countersign the RMA with villa owners. This enabled Omni to represent to villa owners that the rental program would be run by a licensed real estate professional and comply with California law, which requires rental agents to hold a real estate license.[5] These brokers of record (Ginsberg, Ims and Combs) were specifically aware that LC Brokerage was the signatory to the RMA, yet they did nothing to manage or supervise the rental program. Instead, they ignored their professional responsibilities and enabled Omni to perpetrate its scheme to self-deal.

63. Third, Omni has used its control over the homeowners associations of the villas (La Costa Resort Villas HOA I and II) to further its scheme. Pursuant to section 6.8 of the CCRs (attached as Exhibit 2), the managing agent of the HOAs — Prime Association Services — is supposed to maintain a list of approved rental agents for villa owners to use if they do not wish to engage LC Brokerage. Yet Prime Association Services has never assembled such a list, at the direction of Omni, which controls the boards of the HOAs. (Omni controls the HOAs as it

_____

[5] *See* Cal. Bus. & Prof. Code § 10131(b).

exercises a block of votes attributable to its ownership of maid's closets and ice machines in the villa buildings that keep Omni employees and agents in perpetual control of the villa HOAs.) This has stifled competition by denying villa owners the chance to use an alternate real estate agent to administer villa rentals. Plaintiffs effectively have no other option but to use the Omni's rental program. Only two owners rent independent of the RMA.

64.     Furthermore, all villas are governed by the UMA (attached as Exhibit 3) that entitles another Omni affiliate (Defendant LC Investment 2010, LLC) to $100 per night or 20% of a villa owners' nightly rental revenue if the owner opts not to use LC Brokerage as its managing agent. This high cost of leaving Omni's rental program forces villa owners into Omni's program, because it is too expensive to rent outside of Omni's control.

65.     In addition, Omni has acted punitively towards villa owners who have had the audacity to leave the rental program — a warning sign to other villa owners of the high costs of leaving their own rental program.

66.     For instance, in 2016, Omni shut off the utilities at a villa owned (through an LLC) by Joshua and Shane Erskine shortly after they decided not to renew the RMA. This was both an effort to frustrate Erskines' independent rentals, and a warning sign to other villa owners of the price of exiting the RMA.

67.     In January 2016, Omni's affiliates sued Joshua Erskine as well as Mario and Rachel Paniccia, who also left the rental program. Omni's suit alleged that these owners were not allowed to identify their villas as being on the grounds of the Omni La Costa Resort in marketing materials to prospective guests, further frustrating their ability to independently rent their villas. On information and belief, Omni intends to take this position with any future villa owners who attempt to rent their villas independent of the RMA.

68.     Omni also alleged in the lawsuit that rental guests of these owners were not entitled to use any Resort amenities, such as the Resort's pools and the

Kidtopia playground, even though (i) renters under the RMA are granted access to these amenities, and (ii) at least one other villa owner renting under the UMA but outside of the RMA (Matthew Palmer) is given access to these amenities for his renters. Omni took this position despite the fact that Omni issues keys to renters under the UMA that provide access to all the Resort's amenities.

69.    Erskine was dragged into litigation for nearly three years before Omni eventually lost its affirmative claims after a two-week trial. The San Diego Superior Court found that under the rental program administered by Omni, Erskine's "returns on investment were often negligible," and that Omni's "marketing of the villa used rates that were so high, potential rentals [were] discouraged and would instead rent lower priced hotel rooms owned by [Omni]…. The rates at which [Omni] advertised the villa for rent were rarely, if ever, achieved." *LC Investment 2010, LLC, et al. v. La Costa Investments, LLC, et al.*, San Diego Superior Court case no. 37-2016-3113, Dkt. No. 283 (Final Statement of Decision) at 2.

70.    Erskine was forced to litigate for years, through motions for summary judgment, ten depositions, voluminous discovery and a two-week trial.

71.    These heavy-handed litigation tactics were a warning to other villa owners who were contemplating challenging or leaving Omni's abusive rental program — that the cost of litigation would quickly outpace any potential recovery.

72.    Plaintiffs Dean and Laurie Beaver got the message. Despite Sims's 2017 email that acknowledged the Resort was running an "overflow" program, not a true rental program, the Beavers have no other options.  Though the CCRs require the managing agent of the villas to maintain a list of approved real estate agents for villa owners to use if they opt not to sign the RMA and rent independently of LC Brokerage, the managing agent has never assembled such a list. Furthermore, owners who rent independently under the UMA must pay

defendant LC Investment 2010 — an Omni affiliate — $100/night or 20% of their rental revenue, whichever is greater. Despite the fact that both the RMA and the UMA are silent as to whether rental guests are given access to the Resort's amenities, Omni has taken the position in other litigation that only guests under the RMA are permitted to use the Resort's amenities.

73.    Omni and the other Defendants have made extensive use of the mail and wires to perpetrate Omni's self-dealing. These uses include:

a. LC Brokerage and Defendant Ginsberg mailed and emailed sales material to prospective villa purchasers that they could rent their villas as part of a rental program run by an "affiliate" of the hotel, knowing that the program was not actually administered by an affiliate but by the hotel owner itself. This was designed to mislead purchasers that an independent rental agency would be administering a rental program on their behalf. These electronic and physical mailings were sent dozens if not hundreds of times.

b. LC Brokerage and Defendant Ginsberg maintained a website under its d/b/a "La Costa Resort Real Estate," accessed by members of the Class, which again highlighted for prospective purchasers that the rental program was run by an "affiliate" of the Resort. Omni provided direction and input as to the content of the website.

c. Between July 2013 and the present, the Beaver Plaintiffs and Class members have received monthly revenue statements through the mail from Omni. The statements detail bookings in each owners' villa and nightly rates, giving the ongoing impression that owners participate in a legitimate rental program, rather than a "overflow" program run for Omni's benefit.

d. Between July 2013 and the present, Plaintiffs and Class members have received payments through bank wires from Omni reflecting

"payments" under the rental program. These bank wires have originated from Omni's bank in Texas, which is the home of its parent company TRT Holdings. Plaintiffs received these bank wires in California, and the other Class members received these bank wires in other states.

e.  Between January 9 and January 12, 2018, Class member Frank Grange exchanged emails with Gary Sims, the former managing director of the Resort. Sims had previously described to Grange and other villa owners that the villa rental program was an "overflow" program. On January 9, Grange reached out to Sims via email and asked Sims to explain why his villa revenues declined 14% year-over-year, even though hotel revenues increased 6%. He also asked Sims to explain what he meant by using the villas as "overflow." In response, Sims falsely characterized the villa rental program as having two components — revenues generated through "villas booked at villa rates," and revenues generated from "overflowing" guests from hotel rooms into the villas. Sims represented that 50% of the villa revenues are generated from "villas booked at villa rates." This statement was false, and Sims knew it to be false. The villas are only booked at retail villa rates substantially less than 50% time — the overwhelming majority of villa revenue comes from overflowing hotel guests into the villas, and from placing discounted-rate customers into the villas. The statement was designed to mislead Grange about the true operation of Omni's rental program and to deflect attention away from the fact that the villas do not generate as much revenue as they should owing to Omni's self-dealing and abusive control over the rental program. Sims also fraudulently stated that "villa rates are higher than the resort rooms rate due to the

difference in size and décor (residential)." Sims did not disclose that the villa retail rates are inflated to steer customers *away* from the villas and into hotel rooms.

f. Every time that LC Brokerage entered into an RMA with a villa owner, it represented in the contract that it would serve as the "sole" and "exclusive" rental management agent for villa owners. On information and belief, drafts of the RMA were sent to Plaintiffs and Class members via mail and email prior to close by LC Brokerage, Ginsberg, Ims and Combs. Yet when these contracts were signed, LC Brokerage had no responsibility over or participation in the rental management program. The agents acting on LC Brokerage's behalf who signed these contracts — including Defendants Ginsberg, Ims and Combs — knew at the time that these contracts were signed that LC Brokerage would not be acting as a "sole" or "exclusive" rental agent, but never disclosed such fact to their clients.

g. For the last six years, Plaintiffs and other Class members have exchanged numerous emails with the Defendants named herein. At no point in the extensive emails between Plaintiffs and Defendants did LC Brokerage, Omni, Ginsberg, Ims or Combs (or any agents acting under their supervision) disclose to Plaintiffs that LC Brokerage was not administering or supervising the rental program, and that Omni was using its control over the rental program to prioritize and accommodate the rental of its own hotel rooms ahead of villas.

74.    Plaintiffs reasonably relied on LC Brokerage's representations in the RMA that it would, at minimum, supervise and run the rental program on villa owners' behalf.

75.     Plaintiffs also reasonably relied on LC Brokerage's representations that it would administer a rental program on their behalf because LC Brokerage was a California-licensed real estate company which employed California licensed real estate brokers to maintain its corporate license.

76.     Defendants have collectively administered a years-long scheme or artifice to defraud through abusive control of the rental management program — running the program for Omni's benefit rather than the benefit of Plaintiffs and the Class. Defendants concealed from Plaintiffs and the Class that LC Brokerage did not run the rental program or have any involvement in supervising the program; that Omni artificially inflated the retail price of villas to keep occupancy rates low and steer customers into its own hotel rooms; and that Omni primarily used the villas as overflow inventory.

## CLASS ACTION ALLEGATIONS

77.     This action is brought on behalf of Plaintiffs individually and, pursuant to Fed. R. Civ. P. 23, on behalf of all individuals and businesses who entered into an RMA with Defendant LC Brokerage to run a rental management program on their behalf. The Class period begins with Omni's acquisition of the La Costa Resort in 2013 and continues to the present. Excluded from the Class are Defendants and their officers, affiliates, directors, employees and the immediate family members of its officers, directors and employees, as well as the defendants in *LC Investment 2010, LLC, et al. v. La Costa Investments, LLC, et al.*, San Diego Superior Court case no. 37-2016-3113.

78.     This action is properly brought against Defendants as a class action for the following reasons: the Class is composed of over a hundred individuals and entities that are geographically widely disbursed; the Class is so numerous that joinder of all members is impracticable; the disposition of Plaintiffs' and Class members' claims in a class action will provide substantial benefits to both the parties and the Court; the Class is readily ascertainable; and there are well-defined

common questions of law and fact because the rights of each Class member were infringed or violated in the same fashion based on Defendants' intentional strategy of steering customers from the villas to the Resort.

79.     The breaches of the RMA arise from a common core of conduct — namely defendants' scheme to self-deal by (1) shifting rental management responsibility under the RMA from LC Brokerage to Omni, (2) using management of the rental program to steer guests to hotel rooms over the villas by overpricing villas and using villas as overflow inventory, (3) failing to adequately advertise the villas, and (4) steering villa owners into the rental program through false and misleading statements that LC Brokerage or an Omni "affiliate" would manage the "rental program" and "maximize" revenues of villa owners.

80.     Notice to the Class can be provided through the records of Defendants, its affiliates and subsidiaries — who maintain a list of all villa owners and send monthly accounting statements to the Class members as a matter of course. Notice to the Class can also be provided by publication, the cost of which is properly imposed upon Defendants.

81.     Questions of law or fact common to the Class predominate over questions that may affect particular Class members. Some common questions include:

    a.  Whether the form RMA requires Defendant LC Brokerage to maximize rental revenues for villa owners;

    b.  Whether the form RMA imposes fiduciary obligations on Defendant LC Brokerage in its management of the rental program;

    c.  Whether the Court's final statement of decision and judgment in *LC Investment 2010, LLC, et al. v. La Costa Investments, LLC, et al.*, San Diego Superior Court case no. 37-2016-3113, is *res judicata* or has collateral estoppel in the present action;

d.  Whether LC Brokerage was permitted to abdicate and/or assign all of its obligations under the RMA to Omni;

e.  Whether LC Brokerage and Defendants Ims and/or Combs were required to notify Plaintiffs and the Class that LC Brokerage ceased doing business in 2017;

f.  Whether LC Brokerage and Defendants Ginsberg, Ims and Combs were required to notify Plaintiffs and the Class that it did not have any supervision over the rental management program, even though it is a counterparty to the RMA;

g.  Whether Omni is an alter-ego of LC Brokerage;

h.  Whether Omni has used (and abused) its control over the rental management program for its own benefit and to the detriment of villa owners;

i.  Whether Omni has intentionally overpriced villas in order to steer customers to its own hotel rooms;

j.  Whether Omni has used villa inventory as overflow inventory to accommodate the Resort when the Resort is fully booked or to accommodate large group bookings;

k.  Whether all Defendants breached the RMA and their fiduciary duties, or aided and abetted in such breach, by steering potential customers from the villas to hotel rooms;

l.  Whether the Defendants have failed to maximize revenues for the villas by using the villas as overflow for the hotel, to accommodate large group bookings and discount bookings;

m. Whether Omni has intentionally instructed Prime Association Services not to assemble a list of approved rental agents that would give villa owners choice in their rental agents; and,

n. Whether villa owners who opt not to rent through the RMA and are therefore governed by the UMA are (i) entitled to have their guests use Resort amenities on the same terms and conditions as guests who rent under the RMA, and (ii) permitted to advertise their units for rent and state that the units are located on the grounds of the Omni La Costa Resort.

82.    Plaintiffs' claims are typical of the claims of the members of the Class in that both Plaintiffs and the Class members entered into identical or materially identical form contracts (the RMA) which require the Defendants to maximize revenues on their behalf, and they all allege that they suffered the same injury — namely Omni's control over the villas to steer potential customers into hotel rooms and away from the villas. Plaintiffs will fairly and adequately protect the interests of the Class in that they have no interest antagonistic to those of the Class members, and Plaintiffs have retained attorneys experienced in class action and complex litigation, as well as the vacation ownership industry.

83.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy for the following reasons (among others):

a. This action will promote an orderly and expeditious administration and adjudication of the Class claims, economies of time and effort and resources will be fostered, and uniformity of decisions will be ensured; and

b. Without a class action, Class members will likely continue to suffer damages, and Defendants' violations of law will go without remedy while Defendants continue to reap and retain the substantial proceeds of their wrongful conduct.

84.    Given the size of the individual Class members' claims and the expense of litigating these complex claims, not all Class members could afford to or would seek legal redress individually for the wrongs Defendants committed

against them, and absent Class members have no substantial interest in individually controlling the prosecution of individual actions.

## FIRST CAUSE OF ACTION

### (Breach of Contract — RMA)

### (Against Defendants LC Brokerage and Omni Hotels Management Corporation)

85.     Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

86.     Under the Rental Management Agreement, Defendant LC Brokerage was appointed as the "sole" and "exclusive" rental agent to act on behalf of villa owners. Amongst the responsibilities entrusted to LC Brokerage, LC Brokerage was required to (1) set rental rates and maximize rental receipts for Plaintiffs and the Class, Ex. 1 ¶ I.3, (2) act as villa owners' exclusive rental agent, Ex. 1 ¶ I.4, (3) collect rent, Ex. 1 ¶ I.6, and (4) account for revenues and expenditures, Ex. 1 ¶ I.7.

87.     Instead, LC Brokerage abdicated all of these responsibilities to Omni, which used its power over the rental management program in a scheme to self-deal.

88.     As the duties under the RMA have been performed by Omni, Omni is a proper defendant on a breach of contract.

89.     Plaintiffs and the Class have been harmed by LC Brokerage's abdication of all responsibility under the RMA as Omni has used its control over the rental program to price the villas for its own advantage, rather than to maximize the revenues of villa owners.

90.     Plaintiffs are entitled to damages in an amount to be proven at trial. Additionally, equity and good conscience require that all sums improperly obtained by Defendants LC Brokerage and Omni Hotels Management Corporation be disgorged and restored to Plaintiffs. Plaintiffs and the Class are also contractually entitled to attorneys' fees and costs of suit pursuant to the RMA.

## SECOND CAUSE OF ACTION

### (Intentional Interference with Contract)

### (Against Defendant Omni)

91.     Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

92.     The RMA is a contract between Plaintiffs/the Class and Defendant LC Brokerage.

93.     Omni knew that under the RMA LC Brokerage was appointed as the "sole" and "exclusive" rental agent under the contract.

94.     Defendant Omni intentionally used its power over Defendant LC Brokerage to usurp all responsibilities of LC Brokerage under the RMA and to perpetuate a scheme to self-deal by steering guests to hotel rooms rather than the villas.

95.     Omni's self-dealing disrupted Plaintiffs' and the Class' contractual relationship with LC Brokerage, who were denied a "sole" and "exclusive" rental management agent which was required to maximize revenues on their behalf.

96.     Plaintiffs are entitled to damages in an amount to be proven at trial. Additionally, equity and good conscience require that all sums improperly obtained by Defendants LC Brokerage and Omni be disgorged and restored to Plaintiffs.

## THIRD CAUSE OF ACTION

### (Breach of Fiduciary Duty)

### (Against all Defendants except LC Investment 2010, LLC)

97.     Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

98.     As a licensed real estate agent, and as the party contractually required to act for the benefit of villa owners, LC Brokerage is a fiduciary to the villa owners with respect to its responsibilities in running the rental program.

99.     LC Brokerage is also a fiduciary to villa owners owing to the extensive control it exercises over Plaintiffs' and the Class members' individually-deeded properties. LC Brokerage contractually controls access to the properties, sets rental rates, administers maintenance of the villas, and otherwise controls nearly all aspects of the day-to-day management of the villas under the RMA.

100.    Defendants Ginsberg, Ims and Combs also owed fiduciary duties to Plaintiffs/Class as the licensed real estate brokers for LC Brokerage.

101.    Omni assumed the fiduciary obligations of LC Brokerage when it stepped into LC Brokerage's shoes by taking over rental management responsibilities under the RMA.

102.    LC Brokerage, together with defendants Ginsberg, Ims and Combs, breached their fiduciary obligations to act for the benefit of villa owners by abdicating all responsibilities under the RMA to Defendant Omni, and by failing to inform villa owners that it abdicated all such responsibility under the RMA to Omni.

103.    Defendant Omni breached its fiduciary obligations by running the rental program to steer customers into its own hotel rooms and away from the villas.

104.    Plaintiffs are entitled to damages in an amount to be proven at trial. Additionally, equity and good conscience require that all sums improperly obtained by Defendants be disgorged and restored to Plaintiffs.

## FOURTH CAUSE OF ACTION

### (Aiding and Abetting Breach of Fiduciary Duty)
### (Against Defendants Omni, Ginsberg, Ims and Combs)

105.    Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

106.    Defendant LC Brokerage breached its fiduciary obligations to Plaintiffs and the Class.

107.   Omni had actual knowledge of that breach of fiduciary duty as the rental program to be run by LC Brokerage was entirely within its control and it had actual knowledge of the terms of the RMA.

108.   Defendants Ginsberg, Ims and Combs also had actual knowledge of LC Brokerage's breach as the managing agents and licensed corporate real estate agents for LC Brokerage.

109.   LC Brokerage breached its fiduciary duties to Plaintiffs and the Class with Omni's substantial assistance and encouragement. Indeed, LC Brokerage acted entirely at the behest and direction of Omni, which usurped all of LC Brokerage's responsibilities over the rental program in a scheme to self-deal.

110.   LC Brokerage also breached its fiduciary duties to Plaintiffs and the Class owing to the acquiescence of Defendants Ginbserg, Ims and Combs, who all failed to properly supervise the rental program even though they were the managing and licensed agents for defendant LC Brokerage. These Defendants also failed to notify Plaintiffs and the Class that LC Brokerage did not run a rental program under the RMA, and that LC Brokerage ceased operations in or around 2017.

111.   Omni's conduct, together with Defendants Ginsberg, Ims and Combs, was a substantial factor in causing harm to Plaintiffs and the Class.

112.   Plaintiffs are entitled to damages in an amount to be proven at trial. Additionally, equity and good conscience require that all sums improperly obtained by Defendants be disgorged and restored to Plaintiffs.

### **FIFTH CAUSE OF ACTION**

**(Violations of Bus. & Prof. Code § 17200 *et seq*.)**

**(Against all Defendants)**

113.   Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

114. The UCL prohibits anything that constitutes an unfair, unlawful or deceptive business practice.  Cal. Bus. & Prof. Code § 17200.  The UCL authorizes a private right of action by anyone who has suffered injury in fact and allows recovery of amounts which may be necessary to restore to any person in interest any money or property which may have been acquired by means of any practice that violates the UCL.  Cal. Bus. & Prof. Code § 17203.

115. Defendants' conduct alleged herein constitutes a violation of the UCL under all three prongs of the statute, namely unfair, unlawful and deceptive acts and practices.

116. Omni, conspiring with Defendants LC Brokerage, LC Investments 2010, Ginsberg, Ims and Combs, and through its control of the La Costa Resort Villas HOA I and II, has set up a lucrative scheme to bilk villa owners out of significant rental revenue. The scheme begins by baiting villa owners into signing a rental management contract with one of Omni's affiliates, LC Brokerage, in exchange for 50% of the rental revenue. LC Brokerage — a licensed real estate corporation, which uses the individual licenses of its brokers of record (Ginsberg, Ims and Combs) — represents that it runs an independent rental program, yet it abdicates all responsibility to Omni. Villa owners are assured under a provision in the CCRs that govern their villas that there are other choices for rental agents, and that a list of Approved Rental Agents is available to select from if they choose not to engage LC Brokerage, but such a list does not in fact exist. Omni has used its control over the La Costa Resort Villas HOA I and II to ensure that such a list is never assembled by Prime Association Services, which is responsible under the CCRs for assembling such a list.

117. Theoretically, there is a way for villa owners to rent villas outside Omni's rental program, but in doing so they owe Defendant LC Investment 2010, LLC (an Omni affiliate) either $100/night or 20% of their nightly rental revenue — a figure that is so high it makes independent rental financially impossible. And in

any event, Omni has acted to frustrate the independent rental efforts of the few villa owners who have opted to exit the RMA by denying their guests access to Resort amenities and suing them for identifying their villas as being located on the grounds of the Omni La Costa Resort.

118.   Omni further does not have policies and procedures in place to facilitate the timely check in and check out of guests who are not renting under the RMA, making the possibility of independent rentals illusory.

119.   All of these efforts are designed to steer villa owners into Omni's rental program, which it runs for its own benefit in a lucrative scheme to self-deal.

120.   This scheme is immoral, unethical, oppressive, substantially injurious, and has no countervailing benefit or reason for its purpose.

121.   The scheme is also unlawful. Cal. Bus. & Prof. Code section 10131(b) defines a real estate broker as "a person who, for a compensation or in expectation of compensation. . . does or negotiates to do one or more of the following acts…:… leases or rents or offers to lease or rent, or places for rent, or solicits listings of places for rent, or solicits for prospective tenants.. leases on real property." The code likewise makes it unlawful to "engage in the business of, act in the capacity of, advertise as, or assume to act as a real estate broker…. Without first obtaining a real estate license." *Id.* at § 10130. Where a corporation performs such acts, it is required to be licensed through a qualified broker-officer. *Id.* at §§ 10211, 10159. A designated broker-officer is required to supervise the activities conducted on behalf of the corporation. *Id.* at § 10159.2(a). Contrary to the statutory scheme governing the duties of real estate brokers and licensed real estate corporations, Omni runs the rental program without a corporate real estate license and without the supervision of any licensed real estate agent. Defendants LC Brokerage, Ginsberg, Ims and Combs have breached their statutory obligations by failing to supervise the rental program ostensibly run by Defendant LC Brokerage.

122.   The scheme is also deceptive in that none of the Defendants have disclosed to Plaintiffs or the Class that (1) the rental program is run by Omni without supervision by LC Brokerage or a licensed real estate professional, or (2) the rental program is not designed to maximize rental receipts for villa owners.

123.   Defendants have derived substantial revenues from their wrongful and deceptive acts.  Plaintiffs have been deprived of property to which they are entitled and/or in which they have a vested interest by means of Defendants' unlawful, fraudulent and unfair business practices.  Pursuant to Business & Professions Code § 17203, Plaintiffs are entitled to an order requiring Defendants to restore to Plaintiffs all the money or property which Defendants may have acquired by means of such unfair competition, and to such injuctive relief as may be necessary.

## SIXTH CAUSE OF ACTION

### (Violations of 18 U.S.C. §1962(c) *et seq.*)

### (Against Defendants Omni, LC Brokerage, Ginsberg, Ims and Combs)

124.   Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

125.   At all relevant times, there existed an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) that consisted of multiple distinct entities and/or individuals who associated in fact together for the common purpose of obtaining control over the villas at the Resort and running a rental program for the benefit of Omni rather than Plaintiffs and the Class. This associated-in-fact enterprise, which operated as an ongoing organization and a continuing unit, consisted of Omni, LC Brokerage, Ims, Ginsberg and Combs (the "RICO Enterprise").  In addition, and alternatively, LC Brokerage was an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) that was used by Defendants Omni, Ims, Ginsberg, and Combs for a pattern of racketeering activity.

126.   Defendants Omni, LC Brokerage, Ginsberg, Ims and Combs are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c) and distinct

from the "enterprise" formed and operated to perpetrate the fraud alleged in this Complaint.

127.   Members of the RICO Enterprise, and each of them, conducted this enterprise on an ongoing basis beginning in approximately July 2013 — when Omni's parent company purchased the La Costa Resort and Spa as well as Defendant LC Brokerage. The enterprise continues to function. Through the conduct of this enterprise, the RICO Enterprise has used the fraudulent means alleged elsewhere in this Complaint to deprive villa owners, including Plaintiffs and the Class, of rental revenues to which they are entitled.

128.   Each member of the RICO Enterprise, including each Defendant, participated in the conduct of this enterprise in furtherance of a common purpose that all members of the RICO Enterprise agreed upon — to enable Omni to run the rental program for its own benefit in a scheme to self-deal and deprive villa owners of significant rental revenues. Through explicit and/or tacit agreements, Defendants and other members of the RICO Enterprise agreed to function and did function as a unit and according to specified roles. Among other things alleged herein:

> a.   LC Brokerage was required both as a matter of contract and fiduciary principles to run a rental program under the RMA for the benefit of Plaintiffs and the Class, including to maximize rental receipts on their behalf. This created a veneer of separation between the rental program and the Resort, assuring villa owners that an independent agent would be acting to maximize rental receipts on their behalf. Instead, LC Brokerage abdicated all of its responsibility under the RMA to its affiliate Omni.

> b.   Defendants Ginsberg, Ims and Combs were successive brokers of record for Defendant LC Brokerage. Under Cal. Bus. & Prof. Code section 10131(b), LC Brokerage was required to hold a real estate

license in order to rent property and acts as a rental agent. A corporation must have a broker-officer to be licensed by the department of real estate. *Id.* at §§ 10211, 10159. Defendants Ginsberg, Ims and Combs acted as LC Brokerage's successive broker-officers during the relevant period alleged herein. They loaned their professional licenses to LC Brokerage in furtherance of the scheme alleged herein, but at no time supervised the rental program or performed any duties under the RMA.

c. Defendant Omni exercised all control over the RMA in order to inflate the retail offering prices of the villas, steer guests into its own hotel rooms and maintain a free block of swing inventory to be used as needed for hotel overflow or large group bookings.

129. Members of the RICO Enterprise directly or indirectly, conducted or participated in the affairs of the enterprise through a pattern of racketeering activity that included a continuous series of predicate acts of mail and wire fraud (18 U.S.C. §§ 1341 and 1343) alleged in paragraph 73 of this Complaint in furtherance of this scheme.

130. The predicate acts alleged in this Complaint constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c). The RICO Enterprise's conduct, including the predicate acts and pattern of racketeering activity, also amount to and/or pose a threat of continued criminal conduct.

131. Defendants and other members of the RICO Enterprises perpetrated this scheme to defraud with the specific intent to deceive and/or defraud Plaintiffs and the Class, and did deceive and/or defraud Plaintiffs and the Class

132. Plaintiffs suffered harm and/or injury to their person or property as a direct and proximate result of the RICO Enterprise's wrongful conduct, including but not limited to damages caused by inducing them to participate in the rental program as opposed to a reasonable alternative investment. Under the provisions of

RICO, Plaintiffs are entitled to recover treble damages, costs of suit and attorneys' fees.

## SEVENTH CAUSE OF ACTION

### (Violations of 18 U.S.C. §1962(d) *et seq.*)

### (Against Defendants Omni, LC Brokerage, Ginsberg, Ims and Combs)

133.   Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

134.   In violation of 18 U.S.C. § 1962(d), members of the RICO Enterprise, and each of them, by their words and/or actions, objectively manifested an agreement to participate, directly and/or indirectly, in the scheme to defraud and operate the RICO Enterprise alleged in this Complaint and thereby conspired with one another to commit the misconduct alleged in this Complaint.

135.   Members of the RICO Enterprise, and each of them, by their words and/or actions, objectively manifested an agreement on the common purpose of this enterprise.

136.   Defendants, and each of them, agreed to commit predicate crimes, aid and abet the commission of predicate crimes by other members of the RICO Enterprise, and/or that some members of the RICO Enterprise would commit the predicate acts for the benefit of all members and/or the RICO Enterprise.

137.   Plaintiffs and members of the proposed Class suffered harm and/or injury to their person or property as a direct and proximate result of the RICO Enterprise's wrongful conduct, including but not limited to damages caused by inducing them to invest in the rental program as opposed to a reasonable alternative investment.

///

///

///

///

## **EIGHTH CAUSE OF ACTION**

### **(Declaratory Relief)**

### **(Against Defendants Omni and LC Investment 2010)**

138.   Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

139.   Defendant LC Investment 2010 is the counterparty or successor-in-interest to Plaintiffs and the Class under the UMA.

140.   Pursuant to the terms of the UMA, Plaintiffs and the Class are required to pay Defendant LC Investment 2010 either $100/night or 20% of their rental revenue, whichever is greater, if they opt to rent their villas outside of the RMA.

141.   Under the UMA, LC Investment 2010 is required to, amongst other things, provide check-in and check-out services for Plaintiffs' and the Class's guests; provide an accounting of revenues; make and accept reservations; and issue room keys.

142.   Both the UMA and RMA are silent with respect to whether rental guests are granted access to the Resort's amenities.

143.   Defendants Omni and LC Investment 2010 have recently taken the position that rental guests under the UMA are only entitled to use amenities around the villa buildings, such as villa pools.

144.   By contrast, Omni has interpreted the RMA to allow rental guests to access resort amenities.

145.   The first villa owner to rent outside of the RMA and only under the UMA, Matthew Palmer, has been granted Resort access for his guests under the UMA.

146.   The statement of decision from *LC Investment 2010, LLC, et al. v. La Costa Investments, LLC, et al.*, San Diego Superior Court case no. 37-2016-3113, Dkt. No. 283 (Final Statement of Decision) requires that rental guests of Defendant

La Costa Investments, LLC be granted Resort access under the UMA under the same terms and conditions as guests under the RMA — namely that guests under the UMA be given access to "all pools, clubs, kidtopia, and internet and cable television," and that no additional payment under the UMA is required for guests to access these amenities.

147.   Renters who are given Resort keys checking in under the UMA are given keyed access to the same Resort amenities as renters checking in under the RMA.

148.   Consistent with the pre-litigation practices of Omni and LC Investment 2010, as well as the preclusive effect of the ruling in *LC Investment 2010, LLC, et al. v. La Costa Investments, LLC, et al.*, San Diego Superior Court case no. 37-2016-3113, Plaintiffs ask for declaratory relief that their rental guests under the UMA are entitled to access to the Resort on the same terms and conditions as rental guests under the RMA.

## NINTH CAUSE OF ACTION
### (Unjust Enrichment)
### (Against all Defendants)

149.   Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

150.   Defendants have unlawfully profited at Plaintiffs' and the Class's expense, and/or received the fruits of the wrongful conduct of other Defendants.

151.   Equity and good conscience require that all sums improperly obtained by Defendants be disgorged by Defendants and restored to Plaintiffs and the Class, and that a constructive trust be imposed on such funds for the benefit of Plaintiffs and the Class.

///

///

## **TENTH CAUSE OF ACTION**

### **(Accounting)**

### **(Against Defendants Omni, LC Brokerage and LC Investment 2010)**

152.   Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

153.   Plaintiffs and the Class have been wrongfully deprived of money, information and documents relevant to LC Brokerage's and Omni's management of the rental program under the RMA.

154.   Defendants have improperly derived profits in connection with their control over and concealment of information from Plaintiffs and the Class.

155.   Plaintiffs and the Class have a right to an accounting for the profits improperly obtained by the Defendants.

156.   Under the circumstances, it is just and equitable to require the defendants to provide an accounting.

**WHEREFORE**, Plaintiffs and Class members pray for judgment against Defendants, and each of them, as follows:

1.   For special damages according to proof;

2.   For general damages according to proof;

3.   For consequential damages according to proof;

4.   For disgorgement of Defendants' profits according to proof;

5.   For restitution of all monies paid to the Defendants or their assigns, according to proof;

6.   For attorneys' fees and costs according to proof;

7.   For pre-judgment and post-judgment interest;

8.   For punitive and/or exemplary damages;

9.   For treble damages pursuant to RICO; and

///

///

10.    For such other and further relief as the court may deem just and proper.

Dated: January 29, 2020                    REISER LAW, p.c.
                                           MICHAEL J. REISER

                                           THE MEADE FIRM p.c.
                                           TYLER R. MEADE


                                           By: */s/ Tyler Meade*_____
                                                Tyler Meade
                                                Attorneys for Plaintiffs