1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

11
12
13
14
15
16
17
18
19
20
21
22
23

| | |
|---|---|
| DEAN BEAVER, et al.,<br><br>                          Plaintiff,<br><br>v.<br><br>OMNI HOTELS MANAGEMENT COPRORATION., et al.,<br><br>                          Defendants. | Case No.:  20-cv-00191-AJB-DEB<br><br>**ORDER:**<br><br>**(1) GRANTING MOTION FOR CLASS CERTIFICATION;**<br><br>**(2) GRANTING MOTION FOR APPOINTMENT OF CO-LEAD CLASS COUNSEL; and**<br><br>**(3) GRANTING MOTION TO SEAL EXHIBIT IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>**(Doc. Nos. 56, 57, 65)** |

24
25
26
27
28

Before the Court is a motion for class certification, motion for appointment of co-lead class counsel, and motion to seal filed by Lead Plaintiffs Dean Beaver's and Laurie Beaver's ("Lead Plaintiffs") Motion for Class Certification. (Doc. Nos. 56, 57, 65.) Defendants Omni Hotels Management Corporation, LC Brokerage, and LC Investment 2010 ("Defendants") filed an opposition to the class certification motion, to which Lead

1

Plaintiffs replied. (Doc. Nos. 61, 64.) For the reasons set forth below, the Court **GRANTS** Lead Plaintiff's motions.

## I.   BACKGROUND

The operative pleading is the First Amended Complaint ("FAC"). (Doc. No. 31.) The Omni La Costa Resort and Spa ("the Resort") in Carlsbad, California, has about 600 rooms. (*Id.* at ¶ 24.) 137 of those rooms are called Villas, and the remainder are Omni hotel rooms. (*Id.*) Villas are owned in fee simple by parties other than the Resort and its affiliates. (*Id.*) LC Brokerage is an Omni affiliate. (*Id.* at ¶ 8.)

98% of Villa owners rent their Villas to resort guests through LC Brokerage pursuant to a Rental Management Agreement ("RMA") between the Villa owners and LC Brokerage.[1] (*Id.* at ¶ 25.) Lead Plaintiffs are husband and wife, and jointly own a Villa at the Resort which is rented to hotel guests pursuant to the RMA. (*Id.* at ¶ 8.)

Lead Plaintiffs' claims are based on the theory that LC Brokerage operates as an alter ego of Omni. (*Id.* at ¶ 85.) They allege that under the RMA, LC Brokerage is required to "(1) set rental rates, (2) act as the Villa owners' exclusive rental agent; (3) collect rent; and (4) account for revenues and expenditures." (*Id.* at ¶ 26.) Lead Plaintiffs further allege that LC Brokerage must "'maximize revenues' on behalf of villa owners." (*Id.* at ¶ 27.) The RMA stipulates that LC Brokerage and Villa owners share Villa revenue. (*Id.* at ¶ 28.) LC Brokerage is entitled to 50% of Villa revenue in exchange for managing Villa rentals, and Villa owners receive the remaining 50%. (*Id.*) Alternatively, when resort guests stay at an Omni hotel room, and not a Villa, Omni earns 100% of the rental revenue for those hotel rooms. (*Id.* at ¶ 49.) In sum, Lead Plaintiffs allege that when Omni rents its hotel rooms directly to guests, it earns 100% of the revenue, as compared to only 50% of the revenue from Villas rented to guests by LC Brokerage (its alter ego).

---

[1] The remaining 2% of the Villas are rented outside of the RMA, through a Unit Maintenance and Operations Agreement ("UMA"). (Doc. No. 56 at 12.)

20-cv-00191-AJB-DEB

Lead Plaintiffs' complaint centers around the allegation that Omni has been engaged in a fraudulent scheme of self-dealing. (*Id.* at ¶ 9.) Specifically, they allege that as the alter ego of LC Brokerage, Omni controls the Villa rental program and intentionally steers guests into Omni's own hotel rooms. (*Id.* at ¶ 127.) Further, Lead Plaintiffs allege that the terms imposed on Villa owners who rent their Villas outside of the RMA, coupled with Omni's control over the Villa homeowner's associations, force class members to participate in the RMA. (*Id.*) Lead Plaintiffs allege that because of Omni's self-dealing, Lead Plaintiffs and the putative class have been deprived of "tens of millions of dollars" in Villa revenue. (*Id.* at ¶ 10.)

The Court previously ruled on a motion to dismiss the FAC, sustaining certain claims and dismissing others. (Doc. No. 38.) Lead Plaintiffs' surviving causes of action are the following: (1) breach of contract; (2) breach of fiduciary duty; (3) aiding and abetting breach of fiduciary duty; (4) a violation of California Business and Professions Code § 17200 under the "unfair" prong; (5) RICO violations; (6) conspiracy to violate RICO; and (7) unjust enrichment. (Doc. No. 56 at 20.)

Lead Plaintiffs now seek class certification and appointment of Tyler Meade, Michael Reiser, and Sam Ferguson as co-lead class counsel. (Doc. Nos. 56, 57.) This Order follows.

## II.   LEGAL STANDARD

A plaintiff seeking to represent a class must satisfy the threshold requirements of Rule 23(a) as well as the requirements for certification under one of the subsections of Rule 23(b). Rule 23(a) provides that a case is appropriate for certification as a class action if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). "In addition to meeting the conditions imposed by Rule 23(a), the party seeking class certification must also show that the action is appropriate under Rule

3

23(b)(1), (2) or (3)." *Astiana v. Kashi Co.*, 291 F.R.D. 493, 503 (S.D. Cal. 2013) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997)).[2]

The plaintiff bears the burden of demonstrating that each element of Rule 23 is satisfied, and a district court may certify a class only if it determines the plaintiff has carried his or her burden. *See Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158–61 (1982); *Doninger v. Pac. Nw. Bell, Inc.*, 564 F.2d 1304, 1308 (9th Cir. 1977). The court must conduct a "rigorous analysis," which may require it "to probe behind the pleadings before coming to rest on the certification question." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Ultimately, the class certification determination is committed to the court's discretion. *See Loc. Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1161 (9th Cir. 2001).

## III.   DISCUSSION

Lead Plaintiffs seeks to certify the following class:

> All villa owners who entered the RMA with LC Brokerage beginning four years before this action was filed to the present, excluding the defendants/counterclaimants in *LC Investment 2010 v. La Costa Investments*, San Diego Sup. Court. Case No. 37-2016-3113, or any officers, directors, employees, affiliates and immediate family members of the Defendants.

(Doc. No. 56 at 21.)[3]

Defendants assert Lead Plaintiffs failed to satisfy the requirements for class certification under Rules 23(a) and 23(b). (Doc. No. 61.) The Court discusses each requirement in turn. *See Gen. Tel. Co. of Sw.*, 457 U.S. at 161 (class actions "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites" have been satisfied).

---

[2] All internal citations, quotations, and alterations in this Order are omitted unless otherwise indicated.

[3] The pinpoint page citations in this Order refer to the ECF-generate page numbers at the top of each filing.

4

### A.    Rule 23(a) Requirements

Rule 23(a) sets forth four requirements for class certification: numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P. 23(a).

#### 1.    Ascertainable

As a preliminary matter, while not delineated in Rule 23, courts have generally required a party seeking class certification under Rule 23(b)(3) to demonstrate the putative class is ascertainable. *See McCrary v. Elations Co.*, No. EDCV 13-00242 JGB (OPx), 2014 WL 1779243, at *3 (C.D. Cal. Jan. 13, 2014). A class is ascertainable if it is administratively feasible for the court to determine whether a particular individual is a member using objective criteria. *See Keegan v. Am. Honda Motor Co., Inc.*, 284 F.R.D. 504, 521 (C.D. Cal. 2012).

Lead Plaintiffs assert that documents Defendants produced in discovery allow for identification of class members. More specifically, Lead Plaintiffs point to annual summaries of revenue disbursements to all villa owners in the RMA from 2015 through 2021. According to Lead Plaintiff, these documents and the class definition are objective criteria by which membership in the proposed class can be ascertained. The Court agrees, and Defendants do not contend otherwise. *See, e.g.*, *Bennet v. N. Am. Bancard, LLC*, 17-CV-00586-AJB-KSC, 2022 WL 1667045, at *3 (S.D. Cal. May 25, 2022) (finding a proposed class ascertainable because reference to the defendant's records would indicate class membership). Accordingly, the Court concludes the proposed class is ascertainable.

#### 2.    Numerosity

Rule 23(a)(1) requires the proposed class to be "so numerous that joinder of all members is impracticable[.]" Fed. R. Civ. P. 23(a)(1). "[I]mpracticability does not mean impossibility"; rather, the inquiry focuses on the "difficulty or inconvenience of joining all members of the class." *Harris v. Palm Springs Alpine Ests., Inc.*, 329 F.2d 909, 913–14 (9th Cir. 1964). "As a general matter, courts have found that numerosity is satisfied when class size exceeds 40 members, but not satisfied when membership dips below 21." *Slaven*

5

*v. BP Am., Inc.*, 190 F.R.D. 649, 654 (C.D. Cal. 2000). In determining whether numerosity is satisfied, the court may draw reasonable inferences from the facts before it. *See Gay v. Waiters' & Dairy Lunchmen's Union*, 549 F.2d 1330, 1332 at n.5 (9th Cir. 1977).

According to Lead Plaintiffs, approximately 80 villa owners joined in the RMA during the relevant period, which the proposed class definition describes as "four years before this action was filed. (Doc. No. 56 at 22.)

Defendants contend that numerosity is not met because the proposed class consists of only 23 members. (Doc. No. 61 at 11.) Defendants arrive at this number by pointing to language in Lead Plaintiffs proposed class definition, which defines the class as including those who "entered the RMA with LC Brokerage beginning four years before the date this action was filed[.]" (*Id.* at 10.) Defendants also argue that Lead Plaintiffs have not shown that joinder would be impracticable. The Court is unpersuaded.

First, while the Court recognizes that Lead Plaintiffs' motion appears to define the class as "[a]ll villa owners who *entered* the RMA with LC Brokerage" from 2016 onward, (Doc. No. 56 at 2, 21 (emphasis added)), the same motion states that Lead Plaintiffs seek to represent "a class of all villa owners . . . who *participated* in a rental management program run by the Defendants" (*Id.* at 12 (emphasis added)). The motion thus creates ambiguity as to whether the class definition captures those who "participated" in the RMA or "entered" into the RMA during the relevant period.

In their reply brief, Lead Plaintiffs make clear they intended the class definition to encompass "all RMA ***participants*** from 2016 onward." (Doc. No. 64 at 9 (emphasis added).) Pursuant to the Court's inherent authority to modify class definitions, the Court modifies the proposed class definition as follows:

> All villa owners who participated in the RMA with LC Brokerage beginning four years before this action was filed to the present, excluding the defendants/counterclaimants in *LC Investment 2010 v. La Costa Investments*, San Diego Sup. Court. Case No. 37-2016-3113, or any officers, directors, employees, affiliates and immediate family members of the Defendants.

*See Turrey v. Vervent, Inc.,* No. 20-CV-0697 DMS (AHG), 2023 WL 163200, at *3 n.1

(S.D. Cal. Jan. 11, 2023) ("District courts have inherent authority to modify class definitions.").

Lead Plaintiffs identified a list of Villa owners who participated in the RMA during the class period, which totals 77 participants. (Doc. No. 56-45.) Because 77 class members is more than 40, numerosity is satisfied. *Slaven*, 190 F.R.D. at 654; *see also Mezzadri v. Med. Depot, Inc.*, No. 14-CV-2330-AJB-DHB, 2016 WL 5107163, at *3 (S.D. Cal. May 12, 2016) ("While there is no set threshold, classes of more than seventy-five members are generally sufficient.").

Second, Defendants' argument that the class is not sufficiently geographically dispersed to render joinder impracticable also fails. (Doc. No. 61 at 10.) Lead Plaintiffs have shown that Villa owners reside across the United States and internationally, including Alabama, Arizona, California, Colorado, Florida, Hawaii, Illinois, Maryland, Michigan, Missouri, Nevada, New Mexico, New York, Ohio, Oregon, Pennsylvania, Texas, Utah, Virginia, Washington, Wisconsin, and Canada, England, and the Netherlands. (Doc. No. 56-2 at ¶ 47.)

Accordingly, for the reasons stated and drawing reasonable inferences from Lead Plaintiffs' assertions, the Court finds numerosity satisfied. *See Gay*, 549 F.2d at 1332 n.5.

### 3.    Commonality

Rule 23(a)(2) requires there be "questions of law or fact common to the class[.]" Fed. R. Civ. P. 23(a)(2). Commonality is satisfied where claims "depend upon a common contention of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. The plaintiff's burden for showing commonality is "minimal." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). Accordingly, "[t]he existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Id.* at 1019.

20-cv-00191-AJB-DEB

Here, Lead Plaintiffs assert there are many common factual and legal questions in this case, including:

> (i) Whether the RMA requires Defendants to maximize rental revenues for Villa owners;
> (ii) Whether the RMA permits LC Brokerage to delegate all authority under the RMA to its affiliate Omni;
> (iii) Whether the RMA imposes fiduciary duties on Defendants;
> (iv) Whether Omni overpriced the Villas;
> (v) Whether LC Brokerage and Omni engaged in a scheme to steer hotel guests away from Villas and into hotel rooms;
> (vi) Whether the RMA terms permitting Omni to control the HOA boards are unfair under California Unfair Competition Law;
> (vii) Whether the fees under the UMA are unfair under California Unfair Competition Law; and
> (viii) Whether Defendants were part of an enterprise operating an alleged scheme to defraud class members.

Lead Plaintiffs' proposed common questions relate to the interpretation of a form contract, which is the RMA. For example, whether the RMA requires Defendants to maximize rental revenue for Villa owners and permits LC Brokerage to delegate all authority under the RMA to Omni are questions of contract interpretation. Indeed, "[w]hen viewed in light of Rule 23, claims arising from interpretations of a form contract appear to present the classic case for treatment as a class action, and breach of contract cases are routinely certified as such." *Menagerie Prods. v. Citysearch*, No. CV 08-4263 CAS (FMO), 2009 WL 3770668, at *9 (C.D. Cal. Nov. 9, 2009).

Where common questions stem from the same source, or focus on the defendant's conduct, commonality is generally satisfied. *See, e.g.*, *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1124 n.3 (9th Cir. 2017) ("These issues are appropriate for classwide litigation because they focus on Leasing Defendants' conduct."); *Baghdasarian v. Amazon.com, Inc.*, 258 F.R.D. 383, 388 (C.D. Cal. 2009) (finding commonality where "the claims of all members of the class 'stem from the same source'"). Additionally, many of Lead Plaintiff's proposed common questions concerning the alleged RICO, breach of fiduciary duty, and UCL claims routinely satisfy the commonality requirement. *See, e.g.*, *Just Film, Inc.*, 847

8

F.3d at 1124 n. 3 (commonality satisfied relative to RICO claims because "[w]hether [Defendants] were part of an enterprise operating an alleged scheme to defraud class members can be resolved on a classwide basis"); *Munro v. Univ. of S. Cal.*, 16-CV-06191-VAP-Ex, 2019 WL 7842551, at *4 (C.D. Cal. Dec. 20, 2019) (commonality satisfied relative to breach of fiduciary duty where proposed common questions included whether defendants were fiduciaries and breached fiduciary duties, and whether the breach caused losses); *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1096–97 (C.D. Cal. 2015) ( commonality satisfied relative to California UCL claims where plaintiff alleged unfair business practices and all class members were exposed to those business practices).

The Court finds commonality in this case is easily satisfied. All class members signed the same form contract that subjects the class to the same rental program. Accordingly, Defendants' actions with respect to the rental program apply equally to all class members. Ultimately, interpreting the RMA as it relates to Defendants' obligations under the RMA may resolve the dispute "in one stroke." *Dukes*, 564 U.S. at 350. This case clearly meets Rule 23(a)(2)'s minimum requirement that there be "even a single common question." *Id.* at 359. As the above listed questions are core factual and legal issues common to the class, the Court finds Lead Plaintiffs' proposed class satisfies the commonality requirement.

Defendants do not meaningfully dispute commonality. For instance, Defendants assert that commonality is not met because there are significant differences in Villa types which render class members differently situated. (Doc. No. 61 at 15.) Defendants further assert that because Villa types are not one and the same, Lead Plaintiffs incorrectly assume that any differences in performance between Villas and hotel rooms are attributable to unlawful conduct on the part of Defendants. (*Id.* at 16.) This is a merits question, and "demonstrating commonality does not require proof that the putative class will prevail on whatever common questions it identifies." *Stockwell v. Cty. And Cnty. of S.F.*, 749 F.3d 1107, 1112 (9th Cir. 2014).

20-cv-00191-AJB-DEB

Additionally, Defendant's argument that commonality is not satisfied because some class members purchased their Villas as an investment property while some did not is unconvincing. As another district court has observed, "variation among class members in their motivation for purchasing the product, the factual circumstances behind their purchase, or the price that they paid does not defeat the relatively minimal showing required to establish commonality." *In re NJOY*, 120 F. Supp. 3d at 1097.

Accordingly, for the foregoing reasons, commonality is satisfied here.

### 4.    Typicality

Rule 23(a)(3)'s typicality requirement provides that "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Gen. Tel. Co. of Sw.*, 457 U.S. at 156. The purpose of the requirement is "to assure that the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). "[T]he typicality requirement is permissive and requires only that the representative's claims are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010). However, a court should not certify a class if "there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Hanon*, 976 F.2d at 508.

Lead Plaintiffs assert typicality is satisfied because they signed the same RMA as all other class members and allege the same injury resulting from the same conduct that allegedly injured class members. (Doc. No. 56 at 32.) Defendants argue typicality is not met because Lead Plaintiffs (1) are not part of the proposed class, (2) face unique defenses, (3) purchased a dissimilar Villa from other class members and for different motivations, and (4) that Lead Plaintiffs' prior litigation makes them atypical. (Doc. No. 61 at 11–14.) The Court addresses the arguments in turn.

### i.    Not a Member of the Proposed Class

First, Defendants assert that Lead Plaintiffs are not members of the proposed class.

10

(Doc. No. 61 at 11.) Defendants' argument, however, relies on their interpretation of the class definition, which the Court earlier dismissed after modifying the class definition under its inherent authority. (*Id.*); *supra* § III.A.2. Accordingly, Defendants' argument that Lead Plaintiffs are not a class member fails here for similar reasons. There is no dispute that Lead Plaintiffs participated in the RMA during the relevant period, and are thus members of the proposed class.

### ii. Unique Defenses

Second, Defendants contend that Lead Plaintiffs face the unique defenses of statute of limitations, laches, estoppel, failure to mitigate, reliance, and prior material breach. (Doc. 61 at 12–13.)

### a) Statute of Limitations

Defendants argue that because Lead Plaintiffs face a statute of limitations defense, Lead Plaintiffs will be preoccupied with overcoming this defense at the expense of other class members whose claims are not barred by the applicable statute of limitations. (*Id.*) Lead Plaintiffs counter that the statute of limitations defense is not unique to them as more than half of the class members may be subject to it. (Doc. No. 64 at 9.) The Court agrees.

A statute of limitations defense may defeat typicality where a considerable portion of class members do not face the defense. For example, in *Taafua v. Quantum Global Technologies, LLC*, the court considered whether typicality was met where approximately half of the proposed class members faced a statute of limitations defense, and the other half did not. *See* No. 18-CV-06602-VKD, 2020 WL 95639, at *7–8 (C.D. Cal. Jan 8, 2020). Reasoning that "the potential statute of limitations issue poses a significant procedural hurdle that does not affect a considerable portion of the putative class's claims," the court found typicality not met in that case. *Id.* at *8.

The opposite is true here. Lead Plaintiffs' interests align with the interests of the class because a majority of them will face a similar statute of limitations defense. Here, of the proposed class members, the record indicates that 86% at most and 72% at minimum may face a statute of limitations defense. Unlike the proposed class in *Taafua*, Defendants

20-cv-00191-AJB-DEB

cannot assert that the statute of limitations defense here "does not affect a considerable portion of the putative class's claims." 2020 WL 95639, at *8. As such, the Court finds a statute of limitations defense is not unique to Lead Plaintiffs and does not defeat typicality here. *See, e.g.*, *Corcoran v. CVS Health*, No. 15-CV-03504-YGR, 2019 WL 6250972, at *5 (C.D. Cal. Nov. 22, 2019) (finding typicality satisfied where defendants made "no actual showing that [lead plaintiffs] are *uniquely* subjected to the statute of limitations" (emphasis in original)).

Accordingly, Defendants' argument relative to the statute of limitations fails.

### b) Laches

Defendants also assert that Lead Plaintiffs face a laches defense. (Doc. No. 61 at 12.) However, under California law, "[l]aches is not available as a defense to [Lead Plaintiffs'] claim for breach of contract seeking money damages." *Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 235 F.3d 1184, 1193 (9th Cir. 2000) (holding that breach of contract claim seeking money damages was an action at law that precluded defense of laches). Accordingly, Defendants' argument relative to laches fails.

The Court acknowledges that Lead Plaintiffs' claim for unjust enrichment "is an equitable rather than a legal claim[.]" *Goldstein v. Gen. Motors LLC*, 517 F. Supp. 3d 1076, 1095 (S.D. Cal. 2021). Defendants, however, fail to adequately address how the defense is unique to Lead Plaintiffs or would preoccupy them. As another district court has found, "[s]imply asserting an affirmative defense, without more, does not undermine typicality. Both the facts and the legal viability of [laches] would require more development before the Court could conclude that they threaten to become the focus of the litigation." *Kihn v. Bill Graham Archives, LLC*, 445 F. Supp. 3d 234, 247 (N.D. Cal. 2020), *rev'd and remanded on other grounds*, No. 20-17397, 2022 WL 18935 (9th Cir. Jan. 3, 2022). Accordingly, the Court does not find the defense defeats typicality.

### c) Estoppel

Defendants further argue that Lead Plaintiffs uniquely face an estoppel defense. (Doc. No. 61 at 12.) Their assertion, however, is devoid of any analysis on how Lead

Plaintiffs would be preoccupied with this defense to the class members' detriment. As discussed, "[s]imply asserting an affirmative defense, without more, does not undermine typicality." *Kihn*, 445 F. Supp. 3d at 247; *see de Lacour v. Colgate-Palmolive Co.*, 338 F.R.D. 324, 338 (S.D.N.Y. 2021) ("[C]ourts refuse certification only when confronted with a sufficiently clear showing of the defense's applicability to the representative plaintiff."). Accordingly, the Court does not find this defense defeats typicality.

### d)  Failure to Mitigate

Defendants next contend that Lead Plaintiffs uniquely face a failure to mitigate defense. (Doc. No. 61 at 13.) District courts in California have found, and this Court agrees, that a defense of failure to mitigate damages generally does not affect typicality. *See, e.g.*, *Longest v. Green Tree Servicing LLC*, 308 F.R.D. 310, 324 (C.D. Cal. 2015).

For example, in *Longest v. Green Tree Servicing LLC*, the court rejected the defendant's argument, finding that a failure to mitigate is not the kind of defense that poses a danger of defeating typicality. 308 F.R.D. at 324. The court explained, "the issue in this case is whether the inflated cost of the insurance force-placed by defendants were caused" by the defendants allegedly unlawful kickback arrangements, "not whether [plaintiffs] . . . acquiesced in defendants' alleged kickback scheme." *Id.* Similarly, the issue before this Court is whether Defendants acted unlawfully in violation of the RMA, not whether class members acquiesced in Defendants' allegedly unlawful scheme. *See id.* In addition, failure to mitigate is a defense Defendants can likely raise against all class members. There is no evidence to the contrary. Accordingly, Defendants' argument fails.

### e)  Reliance

Defendants additionally argue that Lead Plaintiffs' lack of reliance defeats typicality. (Doc. No. 61 at 13.) In support, Defendants rely on this Court's reasoning in *Williams v. Progressive County Mutual Ins. Co.* 17-CV-02282-AJB-BGS, 2020 WL 7078888 (S.D. Cal. Dec. 3, 2020). There, this Court considered whether the lead plaintiff satisfied typicality where the alleged injury arose from the defendant insurance adjuster's misrepresentation of the value of loss to a car after the car was damaged. *Id.* at *6. The lead

13

1  plaintiff alleged that the defendant's software "artificially reduce[d] the model value, age,
2  and condition of the vehicles at the time of the loss." *Id.* This Court noted that "[t]he
3  gravamen of [the plaintiff's] claims is that [the defendant] misrepresented the [actual cash
4  value] of total loss vehicles and failed to state that its . . . system was structured" so as to
5  make such misrepresentations. *Id.* Notably, that case was brought under Texas law, and the
6  applicable law there required the plaintiff to rely on the defendant's alleged
7  misrepresentations. *Id.* at *7 ("Texas district courts have held that reliance is an element of
8  claims brought [in this case]."). Because the lead plaintiff there did not rely on the
9  defendant's misrepresentations, this Court did not find typicality satisfied. *Id.* at *6–7.

10  The instant case is distinguishable. Most of Lead Plaintiff's claims—namely, the
11  breach of contract, UCL, and RICO claims—do not require reliance. *See, e.g.*, *Oasis W.*
12  *Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011) ("[T]he elements . . . for breach of
13  contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for
14  nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff.");
15  *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1105 (N.D. Cal. 2007) (explaining
16  that reliance is not required for claims brought under the "unfair" prong of the UCL, and
17  that causation may be alleged more generally); *In re Chrysler-Dodge-Jeep Ecodiesel*
18  *Mktg., Sales Pracs., and Prods. Liab. Litig.*, 295 F. Supp. 3d 927, 970 (N.D. Cal. 2018)
19  ("[R]eliance is not a necessary element of a RICO claim.").

20  The Court recognizes California courts have found that reliance is required for Lead
21  Plaintiff's claims for breach of fiduciary duty and aiding and abetting breach of fiduciary
22  duty claims because breach of fiduciary duty usually constitutes constructive fraud. *See*
23  *Assilzadeh v. Cal. Fed. Bank*, 82 Cal. App. 4th 399, 415 (2000). Further, the California
24  Supreme Court explained that "[j]ustifiable reliance, and actual damages are also essential
25  elements of . . . constructive fraud." *Alliance Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226,
26  1254 at n. 4 (1995). While Defendants may argue that Lead Plaintiffs did not rely on the
27  representations in the RMA to defeat these claims, that alone is insufficient to defeat
28  typicality.

14

20-cv-00191-AJB-DEB

As previously noted, to show that Lead Plaintiffs are atypical, there must be "a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Hanon*, 976 F.2d at 508. Thus, the question turns to whether Lead Plaintiffs would be preoccupied with overcoming the defense of reliance.

Lead Plaintiffs will likely not be preoccupied with defeating the reliance defense. According to Defendants, Lead Plaintiff Dean Beaver's deposition demonstrates a lack of reliance. (Doc. No. 61 at 13.) Defendants contend that he expected Omni to run the rental program under the RMA, so LC Brokerage's alleged abdication of responsibility to Omni could not have harmed Lead Plaintiff. (*Id.*) Defendants point to Dean Beaver's deposition, in which he states, "I was under the impression [the Villa] was going to run very similar to my other two hotel condos, which was always signing the rental agreement with the hotel itself." (Doc. No. 61-1 at Exh. 4, 69:2–5.) Dean Beaver counters that his answer was taken out of context and misconstrued. (Doc. No. 64 at 11.) The Court agrees.

Indeed, in the same deposition, Dean Beaver answered that while the hotel did market his Villa, he "also looked to the property management company to represent [him] and do whatever marketing aspects it needed to do as well for the return that they were getting for me." (Doc. No. 61-1 Exh. 4, 70:20–23.) Further, in the same deposition, he explained following:

> The major aspect of my claim is about the fact that *I believe* that I was being represented by my property management company, LC Brokerage, to maximize my returns and rentals . . . for the property. And that they were looking out for my best interest as an affiliate of Omni, to find out . . . that was actually not the case and it seemed as if . . . the revenues were being turned towards Omni in conjunction with LC Brokerage[.]

(Doc. No. 64-4, 15:5–14 (emphasis added). While Dean Beaver's deposition reflects some inconsistencies, Defendants have not pointed to direct evidence of his lack of reliance. Importantly, absent direct evidence of a lack of reliance, a rebuttable presumption of justifiable reliance arises in constructive fraud claims under California law. *See William Morris*, 478 F. Supp. 3d at 945 n.5 ("California law presume[s] reasonable reliance upon

15

the misrepresentation or nondisclosure of the fiduciary, absent direct evidence of a lack of reliance."). At best, Defendants' suggestion that Dean Beaver did not justifiably rely on the representations in the RMA that LC Brokerage would be running the rental program is circumstantial evidence of his lack of reliance. This is insufficient to defeat a presumption of justifiable reliance. *See id*. Further, because all class members signed the same RMA, each class member may similarly be exposed to this defense. The Court therefore does not find Lead Plaintiffs would be preoccupied with this defense. *See Hanon*, 976 F.2d at 508.

* * *

Accordingly, for the above stated reasons, the Court does not find that Lead Plaintiffs are subject to unique defenses that would defeat a finding of typicality in this case.

### iii.    Prior Litigation

Third, Defendants contend that Lead Plaintiffs' prior litigation experience involving their other properties which are similar to the Villa at issue here defeats typicality. (Doc. No. 61 at 13.) Lead Plaintiffs counter that their prior experience of successfully leading a prior class to a significant settlement recovery boosts their credentials and does not make them atypical. The Court agrees. *See, e.g.*, *Testone v. Barlean's Organic Oils, LLC*, No. 19-CV-169 JLS (BGS), 2021 WL 4438391, at *11 (S.D. Cal. Sept. 28, 2021) (noting that a plaintiff's prior litigation experience "may in fact boost his adequacy as a class representative" and that "[r]epeat litigants may be better able to monitor the conduct of counsel, who as a practical matter are the class's real champions.").

Moreover, *Hanon* and *Hoexter v. Simmons*—the cases on which Defendants rely to show atypicality—are distinguishable. Unlike in those cases, Lead Plaintiffs' prior litigation experience is not so extensive as to render them atypical or subject them to a unique reliance defense as analyzed above. *Cf. Hanon*, 976 F.2d at 508 (no typicality where the proposed plaintiff had extensive litigation experience in prior securities litigation, buying minimal shares of stocks in various companies and bringing suit); *Hoexter v. Simmons*, 140 F.R.D. 416, 422–23 (D. Ariz. 1991) ("The court agrees with plaintiffs that

16

some prior litigation experience need not handicap a Class representative in representing the class and may even tend to enhance that capability. The prior litigation in which Cooperman and Lord have served as plaintiffs is so extensive, however, that they will inevitably be subject to unique defenses concerning their reliance on the market's integrity in purchasing stock.").

Accordingly, the Court does not find Lead Plaintiffs' one prior litigation experience render their claims atypical of the class.

### iv.    Reasons for Purchasing a Villa

Next, Defendants assert that Lead Plaintiffs are atypical because they purchased the Villa as a new construction unit while class members purchased Villas as resales. (Doc. No. 61 at 14.) Defendants appear to suggest, but do not clearly state, that the differences between Lead Plaintiffs' and class members' reasons for purchasing a Villa mean that they have conflicting interests to protect. Yet, "factual differences will not render a claim atypical if the claim both arises from the same event, practice, or course of conduct that gives rise to the claims of the class members and is based on the same legal theory." *Sarviss v. Gen. Dynamics Info. Tech., Inc.*, 663 F. Supp. 2d 883, 909 (C.D. Cal. 2009) (*citing* 1 Newberg on Class Actions (4th ed.) § 3:15).

The Court finds the asserted factual differences are inconsequential to typicality in this case. Lead Plaintiff's claims arise from the same alleged course of conduct affecting all participants of the RMA—namely, that Defendants steered resort guests away from Villas and into Omni's hotel rooms. (Doc. No. 31 at 9.) Lead Plaintiffs allege, and Defendants do not refute, that Defendants were to "maximize revenues" under the RMA, which Lead Plaintiffs allege Defendants did not do. (*Id.*) Applying *Sarviss*, the events giving rise to the claims are the same amongst class members such that their varying motivations for purchasing a Villa do not affect typicality.

Additionally, Lead Plaintiff's and the class members' legal theories are the same. Because all class members participated in the RMA, all of the class members' claims are proceeding under the same legal theories for recovery. This conclusion is underscored by

the fact that the alleged breach of the RMA affected all class members equally because the RMA is a form contract. *See Abbit v. ING USA Annuity*, No. 13-CV-2310-GPC-WVG, 2015 WL 7272220, at *5 (S.D. Cal. Nov. 16, 2015) (finding typicality satisfied where the lead plaintiff's and class member's claims arose out of conduct affecting all class members who were party to a "relatively uniform" contract). Here, the RMA is more than just "relatively uniform"; each RMA is identical to one another. (Doc. No. 56 at 13.)

Accordingly, the Court finds that Lead Plaintiffs' reason for purchasing their Villa does not defeat typicality.

### v. Prior Material Breach

Finally, Defendants assert that Lead Plaintiffs' prior material breach of the RMA defeats typicality. (Doc. No. 61 at 14.) Lead Plaintiffs assert that their alleged breach does not raise a conflict between themselves and class members. (Doc. No. 64 at 14.) The Court agrees.

Lead Plaintiffs' alleged prior material breach will defeat typicality if "there is a danger that absent class members will suffer if [Lead Plaintiffs are] preoccupied with defenses unique to [them]." *Hanon*, 976 F.2d at 508. Defendants rely on *Martinez v. Welk Group, Inc* to argue that Lead Plaintiffs will be so preoccupied. (Doc. No. 61 at 14.) There, this Court found a lead plaintiff's claims and defenses to be atypical because the lead plaintiff (1) had peculiar sensitivities to mold, where class members did not, (2) had signed a contract that superseded the contract on which his breach of contract claim was based, and (3) had failed to pay annual fees of about $1,480, which put him in breach of his contractual obligations. No. 9-CV-2883 AJB, 2012 WL 2888536, at *3 (S.D. Cal. July 13, 2012). This Court stated that notwithstanding the lead plaintiff's sensitivities to mold, his atypicality with respect to the contract was enough to defeat typicality. *Id.* at *4.

Here, Lead Plaintiffs admitted to conduct that could constitute breaching the contract one time in October 2020 (by renting the unit on their own/outside the RMA). And based on Dean Beaver's deposition, they may have breached on other occasions. Lead Plaintiffs argue that the alleged breach is not enough to defeat typicality for two reasons. The first is

18

that Defendants cannot establish breach because LC Brokerage's leasing license had expired by the time Lead Plaintiffs rented the unit on their own. The second is that the breach entitles Defendants only to about $600, which is not sufficient to become a major focus of the litigation.

In determining whether the presence of unique defenses will defeat typicality, courts have required sufficient factual and legal development to support a finding that the defense would become the focus of the litigation. *Kihn*, 445 F. Supp. 3d at 247 (N.D. Cal. 2020). *See also, e.g.*, *In re Omnicom Group, Inc. Sec. Litig.*, No. 2 Civ. 4483 (RCC), 2007 WL 1280640, *4 (S.D. N.Y. Apr. 30, 2007) ("A court need not definitively resolve whether such defenses would succeed on their merits, but also need not deny certification merely because of the presence of a colorable unique defense . . . In practice, courts in this Circuit navigate a middle course between these two extremes . . . refusing certification only when confronted with a sufficiently clear showing of the defense's applicability to the representative plaintiff.").

Here, the evidence is not clear whether the defense of prior material breach is indeed a "unique" defense. For example, Defendants merely presume that a prior material breach is unique to Lead Plaintiff. (Doc. No. 61 at 14.) They have not pointed to evidence that other class members would not be subject to the defense. Moreover, this case is distinguishable from *Martinez*. Unlike in that case, the alleged prior material breach here involves a relatively small amount of damages and is thus unlikely to preoccupy Lead Plaintiffs.

Considering the lack of evidence that a prior material breach defense would not apply to other class members and the relatively minor consequence of the alleged breach on Lead Plaintiffs, the Court does not find the defense would cause preoccupation issues here. Should later discovery prove otherwise, Defendants may renew their objection to certification. *See United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL–CIO, CLC v. Conoco Phillips Co.*, 593 F.R.D. 802, 809 (9th Cir. 2010) ("[A] district court retains the flexibility to address problems with a certified

19

class as they arise, including the ability to decertify.").

Accordingly, based on the foregoing, the Court declines to find Lead Plaintiffs' claims to be atypical at this time.

### 5.   Adequacy

Rule 23(a)(4) requires the class representative to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In assessing this requirement, courts within the Ninth Circuit apply a two-part test, asking: (1) does the named plaintiff and her counsel have any conflicts of interest with other class members?; and (2) will the named plaintiff and her counsel prosecute the action vigorously on behalf of the class? *See Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).

Lead Plaintiffs assert, and the Court agrees, that both prongs are met here. Lead Plaintiffs "possess[ed] the same interest and suffer[ed] the same injury as the class members." *Amchem Prods. Inc.*, 521 U.S. at 625–26. For example, Lead Plaintiffs and the class possess the same interest because class members share common grievances against Defendant and share a common goal to obtain damages and restitution. (Doc. No. 56 at 33.)

Defendants point to two alleged conflicts. The first is that Lead Plaintiffs and class members purchased Villas for different reasons. (Doc. No. 61 at 16–17.) The second is that Lead Plaintiffs' proposed damages model treats class members who own multiple bedroom Villas as if they own single bedroom Villas. (*Id.* at 17.)

As to the first conflict, Defendants fail to identify how the reason underlying Lead Plaintiffs' Villa purchase makes Lead Plaintiffs' interest antagonistic to the class. Whatever reason a class member had for purchasing a Villa does not change the alclass members were allegedly aggrieved by the same conduct resulting in the same damages: lost revenue.

As to the second conflict, Defendants misstate the proposed damages model. Contrary to Defendants' assertion, "[f]or two- and three-bedroom Villas owned by class

20-cv-00191-AJB-DEB

members, [the damages model] will treat those as two- and three-room for purposes of calculating damages . . . as they are comprised of smaller Villas rooms which can be independently rented." (Doc. No. 56-1 at ¶ 22.)

Defendants' argument as to the damages model also fails because it is speculative. For the conflict to arise, the class would have to first obtain a favorable judgment, and "[a] conflict must be manifest at the time of certification rather than dependent on some future event or turn in the litigation that might never occur" in order to defeat adequacy. *See Mendell v. Am. Med. Response, Inc.*, NO. 19-CV-01227-BAS-KSC, 2021 WL 1102423, at *3 (S.D. Cal March 23, 2021). Accordingly, Defendants' arguments relative to conflicts between Lead Plaintiffs and the class are unavailing.

Next, Defendants challenge the adequacy of Laurie Beaver as co-Lead Plaintiff. (Doc. No. 61 at 16.) Defendants assert that Laurie Beaver is not an adequate class representative because of her limited knowledge about the litigation. (*Id.*) However, a named plaintiff need possess only a "minimal degree of knowledge about the class action to be an adequate representative." *D.C. ex rel Garter v. Cnty. of San Diego*, No. 15-CV-1868-MMA (NLS), 2017 WL 5177028, at *12 (S.D. Cal. Nov. 11, 2017); *see also Moeller v. Taco Bell Corp.*, 220 F.R.D. 604, 611 (N.D. Cal. 2004) (requiring a plaintiff be "startlingly unfamiliar" with the case to be deemed inadequate). Other courts have also focused on whether the named plaintiff understands his or her role as class representative to determine whether the named plaintiff is an adequate representative by considering, for example, whether they had "difficulties with recollection and lack of familiarity with the litigation." *Gordon v. Sonar Cap. Mgmt. LLC*, 92 F. Supp. 3d 193, 200–01 (S.D.N.Y. 2015); *see Scott v. New York City Dist. Council of Carpenters Pension Plan*, 224 F.R.D. 353, 356 (S.D. N.Y. 2004) (finding adequacy not satisfied where the named plaintiff was alarmingly unfamiliar with the case and had little or nonexistent knowledge of their role as class representative).

Laurie Beaver is an adequate representative. She does not have difficulties with recollection, is not alarmingly unfamiliar with the case, and has knowledge of her role as

21

class representative. Indeed, during her deposition, she testified about the nature of this case, explaining that she believed the property she and Dean Beaver purchased was not rented properly as specified in the RMA, which caused economic damages. (Doc. No. 64-10, at 11:19–22; 14:11–14.) Her deposition shows she has sufficient knowledge of the class action. The evidence therefore does not support a finding that Laurie Beaver is "startlingly unfamiliar" with the case. *Moeller*, 220 F.R.D. at 611. Further, there is no indication in this case that Laurie Beaver is unwilling to work with counsel to review her duties and obligations. *See D.C. ex rel Garter*, 2017 WL 5177028, at *12 (finding adequacy satisfied because class representative plaintiff stated she would "review any duties and discuss her obligations with counsel," even though she stated she did not understand she would be making decisions in the litigation).

Lead Counsel is also well-qualified to represent the proposed class. The record shows that Mr. Ferguson, Mr. Reiser, and Mr. Meade have vigorously prosecuted and will continue to vigorously prosecute the claims of the class and submitted documentary evidence of their experience in litigating class actions, including other class actions involving hotel-condominium units. (Doc. Nos. 57-1; 57-2; 57-3.) There is no indication that the firms' interests are adverse to those of the class, and Defendants do not dispute class counsels' adequacy. Accordingly, the Court finds Mr. Ferguson, Mr. Reiser, and Mr. Meade will fairly and adequately represent the interests of the class and may be appointed co-lead class counsel. *See* Fed. R. Civ. P. 23(g)(2).

Accordingly, for the above stated reasons, the Court finds adequacy is satisfied.

### B.    Rule 23(b)(3) Requirements

Next, certification under Rule 23(b)(3)—the subsection under which Lead Plaintiffs seek certification—is appropriate only where the plaintiff establishes that (1) issues common to the class predominate over issues affecting individual class members; and (2) the class action device is superior to other methods available for adjudicating the dispute. *See* Fed. R. Civ. P. 23(b)(3). The Court discusses these requirements in turn.

22

### 1. Predominance

The predominance analysis "focuses on the relationship between the common and individual issues." *Hanlon,* 150 F.3d at 1022. "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Id.* In other words, certification is proper where "questions of law or fact common to class members predominate over any questions affecting only individual members." *Tyson Foods v. Bouaphakeo*, 577 U.S. 442, 453 (2016). Individual questions are questions where "members of a proposed class will need to present evidence that varies from member to member." *Id.* A common question is one where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Id.* "Even if Rule 23(a)'s commonality requirement may be satisfied . . . the predominance criterion is far more demanding. *Amchem Prods. Inc*, 521 U.S. at 623–24.

Lastly, certification of a 23(b)(3) class is appropriate if "one or more of the central issues in the action are common to the class and can be said to predominate . . . even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Senne v. Kan. City Royals Baseball Corp.*, 934 F.3d 918, 938 (9th Cir. 2019). *See also Leyva v. Medline Indus. Inc.,* 716 F.3d 510, 514 (9th Cir. 2013) ("[T]he presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3).").

A district court's assessment of predominance "begins, of course, with the elements of the underlying cause of action." *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020 (9th Cir. 2011), *abrogated on other grounds by Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). The Court discusses each cause of action in turn.

### i. Breach of Contract

"[T]he elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3)

23

defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis*, 51 Cal. 4th at 821. Lead Plaintiffs assert that demonstrating Defendants' breach of contract depends on common proof such that predominance is met as to their breach of contract claim. (Doc. No. 56 at 27.) The Court agrees.

The breach of contract claim alleges violations of the RMA, a form contract. Courts routinely certify class actions involving breaches of form contracts. *See, e.g.*, *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 42 (1st Cir. 2003) ("Overall, we find that common issues of law and fact predominate here. The case turns on interpretation of the form contract, executed by all class members and defendant."); *Winkler v. DTE, Inc.*, 205 F.R.D. 235, 243 (D. Ariz. 2001) (rejecting argument that individual issues would predominate in breach of contract claim where standard form contracts were used, even though class members signed the contract there under different circumstances). Moreover, Defendants' alleged breach—namely, that Defendants have unlawfully priced the villas too high in order to steer business to the Resort in violation of the RMA's duty to maximize revenues—will be established by common proof. Resolution of the breach of contract claim would thus predominantly entail interpretation of the RMA (the terms of which are identical for all class members) and consideration of Defendants' conduct.

Defendants argue that common issues cannot predominate because Lead Plaintiffs (1) previously entered into a prior version of the RMA, (2) have refuted any materiality of Defendants' alleged breach, (3) are subject to unique defenses, and (4) breached the RMA. (Doc. No. 61 at 20.) As to the first two points, Defendants do not explain the significance of the prior RMA nor is the record sufficiently developed on their argument that Lead Plaintiffs have refuted materiality of Defendants' breach. The Court rejects these assertions. As to the last two points, the Court previously analyzed and rejected these arguments above. *See supra* § III.A.4.

Accordingly, the Court finds predominance met as to Lead Plaintiffs' breach of contract claims. *See Bally v. State Farm Life Ins. Co.*, 335 F.R.D. 288, 295 (N.D. Cal. 2020) (common questions predominate where the terms of the contract at issue were "the same

for all class members" and the majority of evidence of breach "is capable of consideration on a class wide basis"); *see also Risinger v. SOC LLC,* 708 Fed. Appx. 304, 306 (9th Cir. 2017) (considering a standardized agreement and finding "the district court did not abuse its discretion by deciding that a common question of contract interpretation predominates" the breach of contract claim).

### ii.      Breach of Fiduciary Duty

To prove breach of fiduciary duty under California Law, a plaintiff must show the existence of a fiduciary relationship, its breach, and damages proximately caused thereby. *Vaxiion Therapeutics, Inc. v. Foley & Lardener, LLP*, 593 F. Supp. 2d 1153, 1169 (S.D. Cal. 2008).

Lead Plaintiffs assert that common issues predominate because whether a fiduciary relationship exists depends upon interpretation of the RMA and Defendants' control over the Villas. (Doc. No. 56 at 28.) The Court agrees.

The common questions in this case focus on Defendant's conduct. Such are: (1) whether Defendants were fiduciaries to Lead Plaintiffs and the class, (2) whether Defendants mispriced the Villas in violation of the RMA, (3) whether Defendants failed to maximize rental rates for the class members, and (4) whether LC Brokerage breached its duty of loyalty to class members in favor of Omni. (Doc. No. 56 at 28.)

These common issues predominate over the single individual issue identified by Defendants—that is, whether Defendants exercised appropriate "business judgment" in setting each class member's Villa rates. Exercising appropriate business judgment likely goes to the issue of damages, which is necessarily an individualized inquiry, but does not defeat predominance. *See Leyva*, 716 F.3d at 514. Further, Defendants' argument appears to belie how Villas were actually priced. Contrary to Defendants' position, it appears the Villas were categorically priced without regard to varying factors like size, location, and décor. (Doc. No. 64 at 16.) Defendants do not meaningfully dispute this and cite only to the RMA terms that allow the exercise of "business judgment" in setting rental rates. (Doc. No. 61 at 21.) The Court is thus unpersuaded that the question of whether Defendants

25

exercised "appropriate business judgment" is an individual inquiry that defeats predominance of the common questions here.

Accordingly, the Court finds predominance satisfied as to Lead Plaintiff's claim for breach of fiduciary duty.

### iii.   Aiding and Abetting Breach of Fiduciary Duty

In California, a plaintiff must prove the following elements to establish a cause of action for aiding and abetting breach of fiduciary duty: "(1) a third party's breach of fiduciary duties owed to plaintiff; (2) defendant's actual knowledge of that breach of fiduciary duties; (3) substantial assistance or encouragement by defendant to the third party's breach; and (4) [that] defendant's conduct was a substantial factor in causing harm to plaintiff." *Nasrawi v. Buck Consultants LLC*, 231 Cal. App. 4th 328, 343 (2014).

Here, Lead Plaintiff's theory is that Omni aided and abetted LC Brokerage's alleged breach of fiduciary duty by running the rental program for LC Brokerage. (Doc. No. 56 at 28.) Defendants make the same argument against predominance here as they did against the breach of fiduciary duty claim. (Doc. No. 61 at 21.)

Lead Plaintiffs' aiding and abetting breach of fiduciary duty claim would likely not require individualized inquiry. California's aiding and abetting breach of fiduciary duty law does not require inquiry into factors that may be unique to individual class members. *See Nasrawi*, 231 Cal. App. 4th at 343 (elements of a claim for breach of fiduciary duty claim concern only the defendants conduct); *see also See Bruhl v. Price Waterhousecoopers Int'l*, 257 F.R.D. 684, 698 (S.D. Fl. 2008) (finding predominance satisfied when state law for aiding and abetting breach of fiduciary duty did not require reliance). Each element of an aiding and abetting breach of fiduciary duty claim under California law is focused only on the defendant's conduct. Because Lead Plaintiffs allege that the breach occurred in violation of the RMA, any aiding and abetting as alleged here likely has a classwide effect that could be proven by classwide proof.

Accordingly, predominance is met as to Lead Plaintiffs' claim for aiding and abetting breach of fiduciary duty.

### iv.   Cal. Bus. & Pro. Code § 17200 Violation

California Business & Professions Code § 17200 prohibits "any unlawful, unfair or fraudulent business act or practice[.]" Bus. & Prof. § 17200. Unfair conduct is conduct that either (1) "offends an established public policy" or (2) "is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers" and the utility of that conduct is outweighed by the harm to the consumer. *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012).

Lead Plaintiffs assert that common questions predominate relative to his UCL claim because the claim focuses on an "objectively unfair scheme that keeps Villa owners trapped in Omni's [rental program.]" (Doc. No. 56 at 29.) Defendants counter that common issues do not predominate because Lead Plaintiffs lack standing, injury, and reliance. (Doc. No. 61 at 22.) The Court discusses the arguments below.

### a)   Standing

In November 2004, California voters approved Proposition 64, which changed standing requirements for UCL claims. *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 318 (2011). As this Court has previously recognized, to have standing to bring California UCL claims, a plaintiff must (1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, *i.e.*, economic injury, and (2) show that the economic injury was the result of, *i.e.*, caused by, the unfair business practice or false advertising that is the gravamen of the claim. *Brecher v. Citigroup Glob. Mkts., Inc.*, No. 9-CV-1344 AJB (MDD), 2011 WL 3475299, at *7 (S.D. Cal. Aug. 8, 2011).

The California Supreme Court established that for purposes of a UCL claim, the alleged injury must be economic. *Kwikset Corp.*, 51 Cal. 4th at 318. ("The plain import of [Proposition 64] is that the plaintiff must now demonstrate some form of economic injury."). Relevant here, the court in *Kwikset* described that while a plaintiff may establish economic injury in "innumerable ways," one option is by demonstrating he or she was "required to enter into a transaction, costing money or property, that would otherwise have been unnecessary." *Id.*

27

Lead Plaintiffs allege that class members had "no other option but to be forced underneath the RMA." (Doc. No. 64 at 22.) This allegation amounts to being "required to enter into a transaction." *Rex v. Chase Home Fin. LLC*, 905 F. Supp. 2d 1111, 1148 (C.D. Cal. 2012) (entering a contract deemed a transaction for UCL purposes). Lead Plaintiffs allege that while in the RMA, Villa owners had "no other viable option" to rent their Villa to guests, and thus make money. (Doc. No. 56 at 12.) While UCL standing requirements are slightly narrower than Article III standing requirements, the ways in which a party can show injury under the UCL are equally as broad. *See Van Patten v. Vertical Fitness Grp. LLC*, 847 F.3d 1037, 1049 (9th Cir. 2017) ("[The economic injury requirement] was not, however, 'intended to be quantitatively more difficult to satisfy' than the threshold for economic injuries that satisfy Article III standing."); s*ee also Rex*, 905 F. Supp. 2d at 1147 (UCL standing does not require a tangible monetary expenditure).

Lead Plaintiffs allege they lost significant revenue they would have earned had they not been forced into the RMA, and seek "benefit of the bargain damages," which "constitute economic injury cognizable under the UCL." *See In re Anthem Data Breach Litig.*, 162 F. Supp. 3d 953, 985 (N.D. Cal. 2016). Therefore, the Court finds Lead Plaintiffs have suffered an injury in fact.

Additionally, Lead Plaintiffs have also sufficiently shown that the injury was caused by the "unfair business practice that is the gravamen of the claim." *Brecher*, 2011 WL 3475299, at *7. Here, Lead Plaintiffs allege that the following business practices are unfair: (1) the high fees imposed on Villa owners who rent outside of the RMA; (2) the RMA term allowing only RMA rental guests access to resort amenities; and (3) Omni's control of the Villas HOA boards that prevent Villa owners from renting through alternative rental agents. (Doc. No. 56 at 29.) Defendants assert that because Lead Plaintiffs were aware of the allegedly unfair RMA terms at the time they entered the RMA, Lead Plaintiffs did not rely on the allegedly unfair terms so as to meet causation for UCL standing. (Doc. No. 61 at 23.) Defendants attempt to construe Lead Plaintiffs' UCL claim as a claim for

28

misrepresentation, but Lead Plaintiffs make clear their claim is focused on the unfair nature of the RMA terms themselves.

According to Lead Plaintiffs, if the RMA did not have the allegedly unfair terms, they would not have suffered the alleged injury. Indeed, Lead Plaintiffs may have been able to rent their Villa through other approved leasing agents and would have been able to make more money than they did under the RMA. Further, the allegedly high Villa room rates may have made Lead Plaintiffs' Villas less desirable among guests, thus reducing Lead Plaintiffs' profitability and precluding them from meaningfully benefiting from the RMA. While there may be other factors that account for Lead Plaintiffs' Villa's unprofitability, the allegedly unfair RMA terms need not be the only cause of Lead Plaintiffs' injury. *See Kwikset Corp.*, 51 Cal. 4th at 327 (noting the unfair business practice need not be the sole or decisive cause of the plaintiff's injury). Accordingly, causation is met.

In conclusion, Lead Plaintiffs have standing to pursue the UCL claim.

### b) Predominance

Lead Plaintiffs' UCL claim falls under the UCL's "unfair prong." (Doc. No. 56 at 2.) Specifically, it focuses on Defendant's alleged scheme that keeps class members "trapped in Omni's rental management program." (Doc. No. 56 at 29.) Lead Plaintiffs assert that common questions—i.e., whether the RMA's term permitting Omni to control the HOA boards are unfair and whether the high fees charged to Villas owners who rent outside of the RMA are unfair—predominate. These common questions and the UCL's focus on the defendant's conduct supports a finding of predominance. Individual inquiries do not appear to overcome the key question of whether the RMA's terms are unfair to the reasonable consumer. *See generally Williams v. Gerber Prod. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) ("unfair business practices claim must be evaluated from the vantage of a reasonable consumer."). Whether Defendants' alleged scheme is unfair is not an individual-specific inquiry. Class members may present the common evidence to show why and how Defendants' business practice offends established public policies or is

29

20-cv-00191-AJB-DEB

"immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Davis*, 691 F.3d at 1169. Similarly, the extent to which the harm to the consumer outweighs the utility of Defendants' business practices is subject to common proof. *Id.* Thus, the Court finds predominance is met as to Lead Plaintiffs' UCL claim.

### v.    RICO – 18 § 1962(c)–(d)

Under 18 U.S.C. § 1962(c), it is unlawful "for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity[.]" 18 U.S.C. § 1962(c). Liability under section 1962(c) "requires (1) the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Cohen v. Trump*, 200 F. Supp. 3d 1063, 1068 (S.D. Cal. 2016). "Plaintiffs also must establish they suffered (1) injury to their business or property, and (2) that [defendants'] RICO violation was a proximate cause of that injury." *In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Pracs. Litig.*, 277 F.R.D. 586, 597 (S.D. Cal. 2011).

Lead Plaintiffs assert that common issues predominate because whether there is an enterprise and whether Defendants engaged in racketeering activity is subject to common proof. (Doc. No. 56 at 30.) Defendants assert that individual issues predominate for Lead Plaintiffs' RICO claims because (1) Lead Plaintiffs cannot establish the existence of a RICO enterprise; (2) Lead Plaintiffs failed to provide evidence of necessary predicate acts; and (3) class members entered the RMA for different reasons. (Doc. No. 61 at 25.)

Defendants' first two argument are without merit. Establishing the existence of a RICO enterprise and predicate acts are questions to be answered at the merits stage. The only question to be resolved at the certification stage under predominance is whether "*questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013) (emphasis in original). Accordingly, the Court finds that Defendants' first two arguments fail to defeat predominance.

Defendants' remaining argument that the causation element would require individual inquiry because class members entered the RMA for varying reasons is unavailing. In Defendants' view, because "evidence establishes that villa owners enter[ed] the RMA for a variety of individual reasons," not all class members relied on Defendants' conduct such that predominance cannot be satisfied. (Doc. No. 61 at 25.) Direct reliance, however, is not an element of the RICO statute. *See Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co. Ltd.*, 943 F.3d 1243, 1259 (9th Cir. 2019) ("The Supreme Court explained that the civil RICO statute has no reliance requirement on its face, and a person may be injured 'by reason of' another person's fraud even if the injured party did not rely on any misrepresentation.").

In any event, the Court does not find the class members' varying reasons for entering the RMA necessarily defeat predominance here. This is especially so because Defendants allegedly forced class members to participate in RMA because they were offered no meaningful alternative. (Doc. No. 31 at ¶ 143.) As Lead Plaintiffs allege, Villa owners who rented outside of the RMA were subject to allegedly extremely unfavorable terms. (Doc. No. 56 at 19.) These common circumstances indicate that the class members' decisions to enter the RMA cannot be explained other than by the inference that class members were relying on LC Brokerage to represent their interests.

Moreover, case law indicates that the key causation inquiry is whether there was a direct relationship between the alleged RICO violation and the plaintiffs' alleged injury. *See id.* Lead Plaintiffs' theory demonstrate a direct relationship that can be established by common proof. According to Lead Plaintiffs, "this case is based on uniform intentional overreach by a fiduciary, namely LC Brokerage's scheme to steer villa rentals to its affiliate Omni" and claim that the "overreach is clearly a but-for and proximate cause of the class's injuries, namely failure to maximize revenues." (Doc. No. 64 at 23.)

Accordingly, for the foregoing reasons, the Court finds predominance is met as to Lead Plaintiffs' RICO Claims.

//

31

### vi.    Unjust Enrichment

"The elements of an unjust enrichment claim are (1) receipt of a benefit, and (2) unjust retention of the benefit at the expense of another." *Goldstein*, 517 F. Supp. 3d at 1095 (S.D. Cal. 2021) (applying California law). Because unjust enrichment is an equitable remedy, "courts of equity should not act . . . when the moving party has an adequate remedy at law[.]"[4] *Id.* (citing *McKesson HBOC, Inc. v. N.Y. State Common Ret. Fund*, 339 F.3d 1087, 1091 (9th Cir. 2003).

Lead Plaintiffs assert that the unjust enrichment claim is amenable to class treatment because the central question subject to common proof is whether Defendants "unjustly profited from the class." (Doc. No. 56 at 32.) Defendants assert that the RMA between LC Brokerage and class members precludes an unjust enrichment claim. (Doc. No. 61 at 25.) Lead Plaintiffs counter that the unjust enrichment claim is against Omni only and that there is no contractual agreement between Omni and class members that would preclude the unjust enrichment claim. (Doc. No. 64 at 23.) The Court agrees with Lead Plaintiffs.

Defendants rely on this Court's decision in *Bennet v. N. Am. Bancard, LLC* for the proposition that a valid express contractual relationship between the parties precludes an unjust enrichment claim. *See* 2022 WL 1667045, at *13 (S.D. Cal. 2022). Defendants are correct in their assertion. Defendants miss, however, that there is no contractual agreement between Omni and class members, as alleged by Lead Plaintiff. A decision that there is or is not a valid agreement between the parties will be determined at the merits stage, during which time Defendants may defeat Lead Plaintiff's unjust enrichment claim.

In this case, individual issues do not predominate for the unjust enrichment claim. This Court in *Beck-Ellman v. Kaz USA* held that common issues predominated when a

---

[4] Should Lead Plaintiffs' breach of contract claim succeed at the merits stage, Lead Plaintiffs would have an adequate remedy at law. In such case, Lead Plaintiffs' claim for unjust enrichment would be precluded. *Goldstein*, 517 F. Supp. 3d at 1095 (S.D. Cal. 2021).

20-cv-00191-AJB-DEB

plaintiff's unjust enrichment claims required common proof of the defendant's conduct and raised the same legal issue for class members. 283 F.R.D. 558, 562 (S.D. Cal. 2012).

The same is true here. Lead Plaintiffs claim that Defendants were unjustly enriched by breaching the RMA and their fiduciary obligations by steering guests into Omni's rooms. Because this inquiry is focused on Defendants' conduct and resultant profit (the evidence for which is subject to common proof), and not on issues particular to any class member, the Court finds predominance satisfied as to the unjust enrichment claim.

### vii.    Damages Model

Under the predominance inquiry, plaintiffs must demonstrate that "damages are capable of measurement on a class-wide basis." *Comcast*, 569 U.S. at 34. Lead Plaintiffs must present a damages model consistent with their theory of liability—that is, a damages model "purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory." *Id.* at 35. "Calculations need not be exact," *id.*, nor is it necessary "to show that [the] method will work with certainty at this time." *Khasin v. R.C. Bigelow, Inc.*, No. 12-cv-2204-WHO, 2016 WL 1213767, at *3 (N.D. Cal. Mar. 29, 2016).

For their claims, Lead Plaintiffs offer three damages models: (a) a restitutionary disgorgement model; (b) a profit disgorgement model; and (c) a deficit in Villa Revenue Per Available Room model ("RevPAR Deficit Model"). The Court discusses each in turn.

### a)  Restitutionary Disgorgement

Lead Plaintiffs' first damages model calculates damages by reviewing owner statements to determine what amount per plaintiff was paid to Defendants in commissions and fees and then returning that amount to class members. (Doc. No. 56 at 35.) Lead Plaintiffs assert that this model requires "no expertise" and "is easily satisfied." (*Id.*) Additionally, Lead Plaintiffs assert that this model applies to their breach of fiduciary duty claims, UCL claims, and unjust enrichment claim. (*Id.* at 36.) Defendants do not directly dispute that restitutionary disgorgement is unavailable in the class action context, but

33

instead argue that profit disgorgement is improper in this case. (Doc. No. 61 at 18.) The Court disagrees.

"Under California law, there are two types of disgorgement remedies: restitutionary disgorgement, which *focuses on the plaintiff's loss*, and nonrestitutionary disgorgement, which focuses on the defendant's unjust enrichment." *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1113 (N.D. Cal. 2018). "[I]t is well-established that nonrestitutionary disgorgement, which focuses on the defendant's unjust enrichment, is unavailable in a . . . class action under the . . . UCL." *In re Tobacco Cases II*, 240 Cal. App. 4th at 800. Accordingly, whether Lead Plaintiffs' damages model is proper depends on how Lead Plaintiffs' damages are characterized.

The court's decision in *Hadley* is instructive. There, the court considered whether the lead plaintiff's damage model satisfied *Comcast* in a UCL case concerning allegedly misleading packaging of the defendant's cereal. *Hadley*, 324 F. Supp. 3d at 1090. Reasoning that the lead plaintiff's damages model sought to recover the amount of money defendants received as a result of the defendant's deceptive sales practices, the court characterized the lead plaintiff's damages as nonrestitutionary. *Id.* at 1114.

The opposite is true here. In *Hadley*, the lead plaintiff's damage model sought to "quantify[] the additional sales Kellogg realized by virtue of its allegedly deceptive omissions." *Id.* at 1114. Here, Lead Plaintiffs seek to quantify the amount class members paid to Defendants in fees and commissions. (Doc. No. 56 at 35.) Unlike the plaintiff in *Hadley*, Lead Plaintiffs' damages model focuses only on the class members' loss. As such, the damages Lead Plaintiffs seek constitute restitutionary damages, which are available in the class action context for Lead Plaintiffs' breach of fiduciary duty, UCL, and unjust enrichment claims. *See, e.g.*, *Meister v. Mensinger*, 230 Cal. App. 4th 381, 396 (2014); *Am. Master Lease LLC v. Indanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 1481 (2014); *Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 636 (N.D. Cal. 2021).

Further, the proposed damages model is not arbitrary because the methodology identifies damages resulting from the alleged wrongdoing. If Defendant LC Brokerage

34

breached its fiduciary duty, then it is not entitled to the benefit paid to it by class members. *See Meister*, 230 Cal. App. 4th at 396; *American Master Lease, LLC*, 225 Cal. App. 4th at 1481. If Defendants LC Brokerage and Omni engaged in conduct in that amounts to unfair business practices, then both are not entitled to the benefit class members gave them, namely, commissions and fees. *See Calhoun*, 526 F. Supp. 3d at 636. Finally, if Defendant Omni was unjustly enriched by class members, it is not entitled to the benefit of the unjust enrichment. *See Monet*, 2010 WL 2486376, at *3.

Accordingly, the Court finds Lead Plaintiffs' first model demonstrates that damages are capable of measurement on a classwide basis. *See Comcast*, 569 U.S. at 34.

### b) Profit Disgorgement

Lead Plaintiffs' second damages model purports to disgorge Defendants' profits. (Doc. No. 56 at 37.) Defendants assert that this damages model is arbitrary because the damage model does not account for any differences between Villa rooms and hotel rooms. (Doc. No. 61 at 18.) Further, Defendants assert this damages model does not account for (1) any benefit received by class members, and (2) the availability of each Villa during the class period. (*Id.* at 19.) The Court agrees with Defendants and finds *In re POM Wonderful LLC*. Instructive. *See* No. ML 10-02199 DDP RZX, 2014 WL 1225184 (C.D. Cal. Mar. 25, 2014).

There, the court considered whether the lead plaintiff's damages model for a UCL misleading advertising claim satisfied predominance under *Comcast*. *Id.* at *2–3. The damages model was a "full refund model," which measured damages as the full amount paid for the defendant's product as a result of the allegedly misleading advertising. *Id.* at *2. The court held that the model did not satisfy predominance because it did not account for any benefit received by the class members. *Id.* at *3 (explaining that the proposed damage model did not account for benefits received by the class members, which may have included "hydration, flavor, energy, or anything else of value").

Although Lead Plaintiffs' claims here concern more than UCL claims, the Court finds *In re POM Wonderful* sufficiently analogous to guide this Court's decision. Lead

35

Plaintiffs seek restitution under the profit disgorgement damages model. "Disgorgement is simply a form of restitution measured by the defendant's wrongful gain rather than by the plaintiff's loss, and is often described as an accounting for profits." *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 663 (9th Cir. 2019). "A party seeking restitution must generally return any benefit that it has received." *In re POM Wonderful LLC*, 2014 WL 1225184, at *3.

Lead Plaintiffs' profit disgorgement damages model does not account for any benefit class members received. Because the model fails to account for value class members may have received by participating in the RMA, the Court does not find the profit disgorgement damages model an appropriate measure of damages here. Like *In re POM Wonderful*, Lead Plaintiffs "do not cite, nor is the court aware of, any authority for the proposition that a plaintiff seeking restitution may retain some unexpected boon, yet obtain the windfall of a full refund and profit from a restitutionary award." 2014 WL 1225184, at *3

Accordingly, the Court does not find the proposed profit disgorgement damages model satisfies predominance under *Comcast. See* 569 U.S. at 34.

### c)  RevPAR Deficit Theory

Lead Plaintiffs' last damages model seeks to reallocate total Villa and hotel room revenue among class members as if room reservations at the Resort had been more equitably distributed between Villas and hotel rooms. (Doc. No. 56-1 at ¶ 6.) Defendants assert that this damages model (1) is arbitrary and unreliable; (2) cannot adequately compare Villa and hotel rooms; (3) does not account for the various configurations into which Villa rooms can be arranged ("Virtual Configurations"); (4) does not account for Villa room availability; and (5) does not account for group bookings at the Resort and the impact group bookings have on Villa performance. (Doc. No. 61 at 19.) Lead Plaintiffs assert that Villa and hotel rooms are inherently comparable in terms of revenue, the damages model accounts for Villa room availability, and the damages model need not account for group bookings or Virtual Configurations. (Doc. No. 64 at 18–22.) The Court agrees with Lead Plaintiff.

The RevPAR Deficit Theory measures damages by first finding comparable Villa and hotel rooms. (Doc. No. 56-1 at ¶ 13.) Next, the RevPAR of each Villa and hotel room would be determined for each day during the class period. (*Id.* at ¶ 14.) RevPAR is calculated by multiplying individual room rates and occupancies. (*Id.*) RevPAR is determined by considering only available rooms. Finally, this damages model would compare RevPAR's between comparable Villa and hotel rooms. (*Id.* at ¶ 15.) Lead Plaintiffs allege that because the RevPAR's between Villa and hotel rooms should be about the same, any excess hotel room RevPAR would be considered "Omni's steering profits," which would then be distributed equally among the class. (Doc. No. 56 at 37.)

Defendant's primary argument against this model is that it is unreliable under *Daubert*. (Doc. No. 61 at 20.) "Before admitting expert testimony, the trial court must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *In re ConAgra Foods*, 302 F.R.D. at 549. "In determining whether expert testimony is admissible, . . . the district court must keep in mind Rule 702's broad parameters of reliability, relevancy, and assistance to the trier of fact." *Sementelli v. Trinidad Corp.*, 155 F. 3d 1130, 1134 (9th Cir. 1998). Because Defendants do not dispute, and the Court readily finds, that Lead Plaintiff's expert testimony is relevant to the damages issue, the Court discusses in depth only the reliability prong.

Reviewing Lead Plaintiffs' expert's declaration and supplemental declaration, the Court finds the expert's methodology reliable. The declarations sufficiently explain his methodology and why it is sound. Specifically, Lead Plaintiffs' expert's supplemental declaration addresses Defendants' assertions that his methodology fails to exclude unavailable rooms and is inherently unreliable because it does not account for differences in room configurations and amenities. (Doc. No. 64-1.) The expert makes clear his methodology captures and compares only available rooms and that the room differences are not material to revenue as testified to by Defendants' Director of Sales and Marketing. (*Id.* at ¶¶ 6–7.) To the extent Defendants wish to challenge the accuracy of expert's

37

conclusions, *Daubert* is not the appropriate vehicle. *See In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d at 1220 ("[T]he test of *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology.").

Further, the damages model is not arbitrary. *See Comcast*, 569 U.S. at 35–36 (noting a damage model may be arbitrary where the model assesses damages based on a methodology that is "speculative" rather than one that arises from "just and reasonable inference[s]"). While there may be some differences in amenities between Villa and hotel rooms, Defendants' Director of Sale and Marketing testified that their daily room rates "should be in the same ballpark." (Doc. No. 56-7 at 33:4–20.) Lead Plaintiffs also allege that when setting prices, Defendants compare their own rooms with competitor hotel rooms. (Doc. No. 64 at 19.) This further indicates that similar rooms can be compared despite differences between their features. The Court finds these circumstances demonstrate that Lead Plaintiffs' proposed model is based on "just and reasonable inference," and not simply on "speculation." *Comcast*, 569 U.S. at 35. It is therefore not arbitrary.

Accordingly, the Court finds the model satisfies predominance under *Comcast*.

### 2. Superiority

Superiority requires consideration of the following: (1) the interest of individuals within the class in controlling their own litigation; (2) the extent and nature of any pending litigation commenced by or against the class involving the same issues; (3) the convenience and desirability of concentrating the litigation in the particular forum; and (4) the manageability of the class action. *See* Fed. R. Civ. P. 23(b)(3)(A)–(D); *Amchem Prods. Inc.*, 521 U.S. at 615–16.

The Court agrees with Lead Plaintiffs that the class action device is superior to other methods available for adjudicating this dispute. As to the first factor, Lead Plaintiffs assert that the cost of individual actions would be prohibitively high. Additionally, the Court finds that consolidating the common issues in this case into a class action furthers judicial

38

20-cv-00191-AJB-DEB

economy such that class treatment is superior. *Ambrosia v. Cogent Commc'ns., Inc.*, 312 F.R.D. 544, 558 (N.D. Cal. 2016) ("[C]lass treatment is likely to reduce litigation costs and promote efficiency relative to trying each case individually.").

As to the second factor, Lead Plaintiffs point out that only one individual has pursued claims related to the dispute here on an individual basis. (Doc. No. 56 at 35.) Importantly, this individual suit arose after the individual was sued by LC Brokerage and LC Investment 2010. (*Id.*) Accordingly, that individual may have other, extenuating reasons not consistent with the class, and thus does not necessarily undermine superiority of a class action here.

As to the third factor, Lead Plaintiffs assert that this Court is the appropriate forum because the Villas are located in Carlsbad, California. (*Id.*) The Court agrees. Superiority is generally satisfied where the actions giving rise to the suit occurred in the forum, and a substantial number of plaintiffs remain in the forum. *See Alba v. Papa John's USA, Inc.*, No. CV 05-7487 GAF (CTx), 2007 WL 953849 at *15 (C.D. Cal. Feb. 7, 2007. Here, most class members remain in the forum, and the dispute occurred within the forum.

Fourth, Lead Plaintiffs assert that "[i]ndividualized actions may result in inconsistent rulings regarding Defendants' obligation under the RMA and UMA." (Doc. No. 56 at 35.) "The Ninth Circuit, along with at least seven other circuits, has held that there is a presumption against dismissing a class action on manageability grounds or that such dismissals are typically disfavored." *Fraser v. Wal-Mart Stores, Inc.*, No. 13-CV-00520-TLN-DAD, 2014 WL 7336673 (E.D. Cal. Dec. 24, 2014).

Accordingly, based on the foregoing factors, the Court finds superiority is met.

## IV.   CONCLUSION

For the reasons stated herein, the Court **GRANTS** the motion for class certification and **APPOINTS** Tyler Meade of the Meade Firm PC, Michael Reiser of Reiser Law PC, and Sam Ferguson of Ferguson Law PC as co-lead class counsel. (Doc. Nos. 56, 57.)

Finally, the Court **GRANTS** Lead Plaintiffs' unopposed motion to seal the 6-page exhibit lodged at Doc. No. 66. The exhibit is a spreadsheet that identifies villa owners, home and/or business addresses and financial information related to the proposed class

39

members' villas. Considering the personal and sensitive nature of the information, the potential for improper use, and this Order's limited reliance on this information to arrive at its decision to certify the class, the Court finds compelling reasons justify sealing. The Clerk of Court is **DIRECTED** to file as sealed the document lodged at Doc. No. 66.

    **IT IS SO ORDERED**.

Dated:  September 18, 2023

Hon. Anthony J. Battaglia
United States District Judge

40

20-cv-00191-AJB-DEB