UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEAN BEAVER and LAURIE BEAVER,<br><br>    Plaintiffs,<br><br>v.<br><br>OMNI HOTELS MANAGEMENT CORPORATION, a Delaware Corporation; LC BROKERAGE CORP., a Delaware Corporation; LC INVESTMENT 2010, LLC, a Delaware Limited Liability Company; WILLIAM IMS, an individual; KELLY GINSBERG, an individual; BRETT ALEXANDER COMBS, an individual; and DOES 1 through 50, inclusive,<br><br>    Defendants. | Case No.: 20-cv-00191-AJB-DEB<br><br>**OMNIBUS ORDER:**<br><br>**(1) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. No. 116);**<br><br>**(2) DENYING AS MOOT PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. No. 117);**<br><br>**(3) DENYING AS MOOT PLAINTIFFS' MOTION TO EXCLUDE EXPERT OPINIONS OF DAVID LASATER AND ROBERT GRISWOLD (Doc. No. 118); and**<br><br>**(4) DENYING AS MOOT DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF JASON BASS (Doc. No. 119).** |

    This is a class action concerning the rental of privately-owned condominiums ("villas") at Omni La Costa Resort & Spa, a world-renowned resort in Carlsbad, California, pursuant to a Rental Management Agreement ("RMA"). The certified Class is as follows:

> All villa owners who participated in the RMA with LC Brokerage beginning four years before this action was filed to the present, excluding the defendants/counterclaimants in *LC Investment 2010 v. La Costa Investments*, San Diego Sup. Court. Case No. 37-2016-3113, or any officers, directors, employees, affiliates and immediate family members of the Defendants.

(Doc. No. 71 at 6.)

Pending before the Court are four motions: (1) a motion for summary judgment filed by Omni Hotels Management Corporation ("Omni"), LC Brokerage Corp. ("LC Brokerage"), LC Investment 2010, LLC, William Ims, and Brett Alexander Combs (collectively, "Defendants"); (2) a motion for partial summary judgment filed by Dean Beaver and Laurie Beaver ("Plaintiffs"); (3) a motion to exclude the expert opinions of Defendants' experts David Lasater and Robert Griswold; and (4) a motion to exclude the expert testimony of Plaintiffs' expert Jason Bass. The motions are fully briefed. For the reasons set forth below, the Court **GRANTS** Defendants' motion for summary judgment and **DENIES AS MOOT** the remaining motions.

## I.    BACKGROUND

The Omni La Costa Resort and Spa ("the Resort") boasts over 400 acres of luscious grounds in a semi-tropical California paradise. It has two championship golf courses and a top-flight wellness spa. For lodging, the Resort has about 600 rooms. Of these rooms, 137 are villas owned by private individuals. The remainder are hotel rooms owned by Omni. Nearly all villa owners rent their villas to the Resort's guests under a Rental Management Agreement ("RMA") with LC Brokerage.

Among others, the RMA contains a provision stating: "The Agent shall set rental rates at which Agent will offer the Property for rental which will in Agent's sole business judgment, maximize the rental receipts for the Property." (Doc. No. 125-3 at 3.) LC Brokerage delegated its responsibility to rent and manage the villas to its affiliate, Omni. Omni also rents and manages the other rooms at the Resort. Under the RMA, Omni receives 50% of villa revenues. Omni receives 100% of its hotel room revenues.

Plaintiffs, Dean and Laurie Beaver are husband and wife, who jointly own a villa at the Resort rented to guests under the RMA. According to Dean Beaver, he was happy with the returns on his villa for the first two years and became dissatisfied with diminishing returns over time. (Doc. No. 141-1 at 60–61.) Plaintiffs filed the instant action on January 29, 2020. (Doc. No. 1.)

The core of Plaintiffs' claims concern Omni's alleged years-long scheme to self-deal through its management of the villas under the RMA. According to Plaintiffs, although LC Brokerage is charged with operating the rental program, it has abdicated its responsibilities to Omni, which has abused its power under the RMA to intentionally steer guests into its hotel rooms rather than the villas—causing the Class Members to lose millions of dollars in revenue.

The operative complaint is the First Amended Complaint. (Doc. No. 31.) After the Court's orders on motions to dismiss, the following claims remain: (1) breach of contract; (2) breach of fiduciary duty; (3) aiding and abetting breach of fiduciary duty; (4) violation of California's Unfair Competition Law ("UCL") under the "unfair" prong; (5) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"); (6) conspiracy to violate RICO; and (7) unjust enrichment. Upon certification of the Class and completion of discovery several years later, the parties filed the instant motions for summary judgment and motions to exclude experts. (Doc. Nos. 116, 117, 118, 119.) This Order follows.

## II.   MOTION FOR SUMMARY JUDGMENT

### A.   Legal Standard

Granting summary judgment under Federal Rule of Civil Procedure 56 is proper if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 319, 327 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party has the initial burden of demonstrating that summary judgment is proper. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152 (1970). The burden then shifts to the opposing party to provide admissible evidence beyond the pleadings to show that summary judgment is not appropriate. *See Celotex,* 477 U.S. at 322, 324. The party in opposition "must identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). In determining evidence during the summary judgment stage, courts do not weigh conflicting evidence or make credibility determinations. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Instead, courts draw all inferences in the most favorable light to the non-moving party. *Id.*

**B.     Discussion**

There is no dispute that Plaintiffs' remaining claims[1] for breach of contract, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, RICO, and RICO conspiracy, all stem from allegations that Defendants failed to meet their obligations under the RMA. Defendants filed a motion for summary judgment, arguing that summary judgment is required for each of Plaintiffs' causes of action because their theories of liability are premised on incorrect interpretations of the RMA. (Doc. No. 116-1 at 9.) The Court agrees.

As more fully explained below, the clear and unambiguous text of the RMA permits LC Brokerage to delegate its rights and duties under the contract to Omni, which include the authority to administer the rental program, set villa rates based on its business judgment, use the villas for overflow, and pursuant to express disclosures in the RMA, does not require Omni to prioritize the villas over hotel rooms. Because all of the conduct that Plaintiffs challenge is clearly contemplated by, and disclosed in, the contract, the Court

---

[1] Plaintiffs stated in their opposition brief that they are no longer pursuing their UCL and unjust enrichment claims. (Doc. No. 137 at 33.) As Plaintiffs have abandoned their UCL and unjust enrichment claims, the Court will enter summary judgment in Defendants' favor on those claims accordingly.

finds no genuine issue of dispute as to whether Defendants breached their duties.[2] Thus, Defendants merit summary judgment in their favor on all of Plaintiffs' claims.

### 1) Breach of Contract

Beginning with the breach of contract claim against LC Brokerage and Omni, "[t]he essential elements of a breach of contract claim are the existence of an enforceable contract, the defendant's breach, and damages to the plaintiff caused by the breach." *Hickcox-Huffman v. US Airways, Inc.*, 855 F.3d 1057, 1062 (9th Cir. 2017).

Under California law, contract interpretation is a question of law. *See TRB Investments, Inc. v. Fireman's Fund Ins. Co.*, 145 P.3d 472, 476 (Cal. 2006). "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." *Bank of the W. v. Superior Ct.*, 833 P.2d 545, 552 (Cal. 1992). "Such intent is to be inferred, if possible, solely from the written provisions of the contract." *TRB Investments, Inc.*, 145 P.3d at 476 (citing Cal. Civ. Code § 1636). The "'clear and explicit' meaning of these provisions, interpreted 'in their ordinary and popular sense'" controls judicial interpretation, unless they are used by the parties in a technical sense or given special meaning by usage. *Id.* (quoting Cal. Civ. Code § 1644). The "language in a contract must be interpreted as a whole, and in the circumstances of the case," *Waller v. Truck Ins. Exch., Inc.*, 900 P.2d 619, 627 (Cal. 1995), "so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other," *AIU Ins. Co. v. Superior Ct.*, 799 P.2d 1253, 1268 (Cal. 1990) (quoting Cal. Civ. Code § 1641).

Here, Plaintiffs contend that LC Brokerage and its sub-agent, Omni,[3] breached their obligation under the RMA to set villa rates to maximize rental receipts. (Doc. Nos. 117 at 3; 137 at 6.) Plaintiffs theorize that "the villas have been overpriced to undersell and drive

---

[2] Because this finding is dispositive of this motion, the Court need not, and does not, consider the other arguments in the parties' moving papers.

[3] Although Omni is not a signatory to the contract, the parties do not dispute that the RMA applies with equal force to Omni as LC Brokerage's sub-agent. *See Streit v. Covington & Crowe*, 98 Cal. Rptr. 2d 193, 197 n.3 (Cal. App. 2000) ("If an agent is authorized by the principal to employ a subagent, the subagent owes the same duties to the principal as does the agent.").

guests into Omni's rooms" and to reserve them "as swing inventory for groups and overflow, which has to overall effect of depressing revenues." (*Id.* at 16, 17.) In support, Plaintiffs present evidence that: (1) Omni set rental rates to prioritize total resort revenues and (2) is not discounting the villas' rates in the same way it is discounting its hotel rooms. The problem for Plaintiff, however, is that nothing in the RMA prevents Omni from doing this. A review of the RMA, in its entirety, makes this conclusion clear.

### a) Key Contract Provisions

We begin, as the Court must, with the language of the contract. The RMA contains several provisions, "each helping to interpret the other," which inform the Court's ruling on summary judgment. *See AIU Ins. Co. v. Superior Ct.*, 799 P.2d at 1268. First, while Plaintiffs correctly observe that Section I.3 ("Rental Rates") of the RMA requires LC Brokerage to "set rental rates" in order "to maximize the rental receipts" for the villas, the same sentence in which those terms appear gives LC Brokerage the discretion to determine what rate to set based on its "sole business judgment." (Doc. No. 125-3, RMA at 3 ("The Agent shall set rental rates at which Agent will offer the Property for rental which will in Agent's sole business judgment, maximize the rental receipts for the Property.").)

Second, the provision describes a standard by which LC Brokerage must establish the rate. That is, LC Brokerage must set rates that are "consistent with comparable competitive price schedules in the Carlsbad, California area." (*Id.*) And even so, LC Brokerage retains discretion to rent the villas at discounted rates, from time to time, depending on seasonal markets, group business opportunities, and such other circumstances that LC Brokerage, "in its sole discretion," determines, most beneficial to the rental program. (*Id.*)

Read and understood as a whole, Section I.3 makes plain that LC Brokerage, and in turn, its sub-agent Omni have sole discretion in setting the villas' rates to maximize rental receipts, so long as it is supported by business judgment and consistent with competitive price schedules in the area.

### b) Evidence of Breach

To establish its breach of contract claim, then, Plaintiffs must present evidence that Omni did not exercise business judgment in setting rates or that the rates set were not consistent with "comparable competitive price schedules" in Carlsbad. (*Id.*) Plaintiffs do not advance argument or evidence specific to the latter.[4] Instead, they challenge only Omni's exercise of discretion and business judgment in setting the villas' rates.

Instructive here, the covenant of good faith requires that in situations where one party is invested with a discretionary power affecting the rights of another, such power must be exercised in good faith. *Carma Developers (Cal.), Inc. v. Marathon Dev. California, Inc.*, 826 P.2d 710, 726 (Cal. 1992). Yet, the covenant may not be read to prohibit a party from doing that which is expressly permitted by an agreement. *Id.* at 728.

Here, Plaintiffs' evidence that Omni failed to set the villas' rate in good faith falls short. As mentioned, Plaintiffs cite evidence that when Omni sets rates, it does not prioritize villa revenues separately, and instead, prioritizes total resort revenues. (Doc. Nos. 117 at 10, 12, 17–18; 137 at 12.) Nothing in the RMA, however, requires Omni to consider villa revenue in isolation or prioritize them over total resort venues. Plaintiffs would have the Court interpret the term "maximize rental receipts" as a mandate to prioritize the villas over hotel rooms. But that interpretation is contrary to the express terms of the contract.

Section VI.1 ("Other Properties Managed") of the RMA states that the villa owners "acknowledge and agree" that LC Brokerage and its affiliates (i.e., Omni) "may be involved in leasing activities which are in direct competition" with the leasing of the villas and "is under no obligation to promote" the villas over competing properties, including those owned by Omni. (Doc. No. 125-3 at 13.) Because the RMA contemplates Omni

---

[4] *See* (Doc. No. 137 at 23 (Plaintiffs noting the duty to set rates comparable to properties in the area but citing no evidence to show breach of this duty)); (Doc. No. 146 at 8 (Defendants stating "[i]t is further undisputed that the Villas are not overpriced compared to villas at 'comparable, competitive properties' in La Costa's competitive set"). *See also Keenan*, 91 F.3d at 1279 ("It is not our task, or that of the district court to scour the record in search of a genuine issue of triable fact. We rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment.").

prioritizing its properties over the villas, it doing so cannot be the basis for breach.

Plaintiffs also point to evidence showing that Omni did not discount the villas' rates as aggressively as it did for its hotel rooms—specifically, the suites. (Doc. Nos. 137 at 7; 13–14, 20–21.) This comparison is flawed. All the industry experts in this case agree that the villas are a higher quality product than the hotel's suites. (Doc. No. 144-35 at 179.) While the two are comparable in terms of size, the villas are superior because of their higher ceilings, more modern finishes, larger and more numerous patios, kitchen/kitchenettes, fireplaces, and exclusive parking. (Doc. Nos. 119-3 at 21, 22; 144-35 at 179–180.) So, simply comparing the villas' rates against that of the hotels' suites does not establish breach. Indeed, Defendants' expert, Sheryl Kimes ("Dr. Kimes") opined that because the villas "have more and better attributes than other Hotel room products at the Resort, considering these attributes for purposes of price tiering was a reasonable and expected practice." (Doc. No. 116-3 at 9.) Dr. Kimes further opined that "Omni has appropriately treated the Villas as the highest tiered room product offered by the Resort, as is the case for similar products at competitor properties." (*Id.*)

Plaintiffs' expert, Jason Bass similarly concluded that he would expect the villas to command higher prices.[5] (Doc. No. 144-35 at 109.) Tellingly, he offers no opinion on whether Omni has exercised sound business judgment in setting the villas' rates. Rather, he opines, based on a comparison of the villas' revenue performance vis-à-vis the suites, that Omni did not set the villas' rates to maximize rental receipts. (*Id.* at 5.) But revenue performance is not the standard for breach under the RMA. Again, the proper measure of any alleged breach is whether Omni used sound business judgment in setting villa rates. This is because the RMA does not require an outcome, but instead, the application of business judgment and discretion.

---

[5] The Court acknowledges the pending motion to exclude Jason Bass's expert opinion in this case. But even assuming his opinions are admissible, they do not create a genuine issue of disputed material fact as to breach.

Sections I.1 and I.5 plainly disclose that there is no guarantee or representation of what rental income the owners will receive, what rate adjustments will be applied, and what occupancy any rate adjustment will facilitate. (*Id.* at 2, 3.) Because the RMA expressly disclaims an obligation to guarantee a certain income, rate, or occupancy, the Court agrees with Defendants that a breach in this case cannot be established by simply comparing the villas' revenues to that of the suites or expressing dissatisfaction with revenues received.

In the end, Plaintiffs present no evidence to create a genuine issue of material fact as to whether the villas' rates were consistent with sound business judgment. They rely merely on relative pricing and price fluctuations between the villas and suites—although all agree that the two are different and command different pricing. And, critically, neither Plaintiffs nor their experts have identified what they believe would have been the appropriate rates for the villas in this case.

Instead, Plaintiffs attempt to show bad faith by pointing to an email from Shahzad Shaikh ("Mr. Shaikh"), Omni's Director of Revenue Management from 2016 to mid-2020, in which he states that the goal for the villas was "not to fill them but to drive [average daily rate] ADR to cover cost and owner share." (Doc. No. 124-14 at 2.) Plaintiffs selectively rely on Mr. Shaikh saying "not to fill them" and "drive ADR" to establish that Omni acted in bad faith by overpricing the villas to undersell and steer guests to its hotel rooms. But reading the email in context reveals, as Mr. Shaikh explained in his deposition, that he was not advocating for the villas' rates to be overpriced not to sell, but rather, was referring to an ADR, as opposed to occupancy, focused approach in setting rates. (*Id.*)

Plaintiffs also ignore that Mr. Shaikh's response arose from Omni's Vice President of Operations, stating: "we have seen in most of our markets that lowering price did not drive occupancy." (*Id.*) Mr. Shaikh and the Vice President's understanding of the relationship between rate and occupancy is consistent with industry research showing that dropping rates does not result in sufficient bookings to offset the lost revenue opportunity. (Doc. No. 116-3 at 10.) Additionally supportive, Dr. Kimes's opined that based on industry research and her over thirty-five years of experience in revenue management, "Omni's

strategy to take an ADR-focused approach to the villas and to maintain rate integrity is a sound approach and the approach that will yield the best long-term revenues for the villas." (*Id.*) Plaintiffs do not refute this evidence.

Plaintiffs' other evidence—including that the villas were sometimes used for "overflow" for Omni's guests when the Resort is full and that the villas were priced significantly higher than and not as aggressively discounted as the suites—are not sufficient evidence of bad faith.[6] The RMA allows Omni to use the villas for overflow. (Doc. No. 125-3 at 14 ("Owner hereby acknowledges and consents to Agent entering into an agreement on Owner's behalf with the Resort whereby the Property is made available to the Resort for use, in its sole discretion, to accommodate either overflow guest rentals when there is insufficient rental space at the Resort".).) And the RMA does not mandate Omni to apply discounts to the villas' rates or promote them over Omni's suites. Rather, it gives Omni discretion to set what rate it deems appropriate and does not require it to discount or vary those rates, so long as its decisions are supported by business judgment. (*Id.* at 3 (reserving the right for Omni to discount rates as it, in its sole discretion, deems most beneficial to the entire rental program), 12 (disclosing that Omni is under no obligation to promote the villas over competing properties).)

In the face of unrebutted expert opinion that industry research and experience support Omni's decision to apply premium pricing to the villas and focus on ADR as opposed to discounting for occupancy, the Court finds that Plaintiffs have not presented evidence sufficient to raise a genuine issue of material fact as to whether Omni exercised sound business judgment in setting the villas' rate. *Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to defeat summary judgment.). There being insufficient evidence of breach, the Court

---

[6] Plaintiffs also cite an email from Omni's Director of Finance, Paul Guccini, stating a goal of maximizing ADR to ensure the villa profit is comparable to that of the hotel's rooms. But the Court does not find that this evidence establishes that Omni did not exercise business judgment in setting the villas' rates. Mr. Guccini is not a revenue manager and does not set the rates. Moreover, the RMA disclaims an obligation to prioritize the villas over Omni's own rooms. (Doc. No. 125-3 at 13.)

**GRANTS** summary judgment on Plaintiffs' breach of contract claim. And because Plaintiffs' claims for RICO and RICO conspiracy are premised on this alleged breach, the Court **GRANTS** summary judgment on these claims as well.

### 2) Breach of Fiduciary Duty

Plaintiffs' breach of fiduciary duty against LC Brokerage and Omni similarly fail. "The elements of a cause of action for breach of fiduciary duty are the existence of a fiduciary relationship, breach of fiduciary duty, and damages." *Oasis W. Realty, LLC v. Goldman*, 250 P.3d 1115, 1121 (Cal. 2011).

Here, Plaintiffs argue that LC Brokerage "had a duty of undivided loyalty to the class and was obligated to act solely for the benefit of its beneficiaries." (Doc. No. 117 at 29 (internal quotation marks omitted).) As discussed earlier, the express terms of the RMA disclaim such a duty. (Doc. No. 125-3 at 13.) It plainly discloses to the villa owners that LC Brokerage and its affiliate "may be involved in leasing activities which are in direct competition" with the leasing of the villas and "is under no obligation to promote" the villas over competing properties. (*Id.*) Because the RMA disavows any duty of undivided loyalty to the villa owners, it cannot be the basis for a breach of fiduciary duty. *See, e.g.*, *Burton Way Hotels, Ltd. v. Four Seasons Hotels Ltd.*, No. CV 11-303 PSG (PLAX), 2014 WL 12572928, at *11 n.2 (C.D. Cal. Nov. 5, 2014) (noting with approval the arbitration panel's finding that the "Four Seasons did not breach its fiduciary duty because it engaged in conduct expressly permitted by the contract.").

Plaintiffs also contend that "LC Brokerage's total abdication of responsibility for rental management to Omni without supervision was a breach of fiduciary. (Doc. No. 117 at 29.) This too fails against the clear and unambiguous terms of the contract. While the RMA does contain a duty to supervise all labor and employees required for renting the villas, that duty to supervise—like all the other duties the RMA imposes on LC Brokerage—may be delegated. Indeed, Section II.1 of the RMA states: "In the exercise of its rights or the performance of its duties hereunder, Agent may utilize the services of the Resort, Agent's affiliates and subsidiaries and their respective employees, agents,

contractors or subcontractors." (Doc. No. 125-3 at 4–5.) There is no dispute that Omni is a lawfully appointed sub-agent and affiliate of LC Brokerage. Because the RMA expressly permits LC Brokerage to utilize Omni's services in the exercise of its rights and duties under the contract, the alleged failure to supervise cannot establish a breach of fiduciary duty. *See Burton Way Hotels, Ltd.*, 2014 WL 12572928, at *11 n.2.

Based on the foregoing, Plaintiffs' breach of fiduciary claim is foreclosed by the RMA's clear and unambiguous terms. Accordingly, the Court **GRANTS** summary judgment on Plaintiffs' breach of fiduciary duty claim. There being no breach of fiduciary duty, the Court **GRANTS** summary judgment on Plaintiffs' claim for aiding and abetting the alleged breach of fiduciary duty against William Ims and Brett Alexander Combs.

### III. REMAINING MOTIONS

Lastly, because the Court grants summary judgment in Defendants' favor on all of Plaintiffs' claims, the Court denies as moot the remaining motions—namely, Plaintiffs' motion for partial summary judgment and the parties' motions to exclude experts.

### IV. CONCLUSION

For the reasons stated herein, the Court **GRANTS** Defendants' motion for summary judgment and **DENIES AS MOOT** all other pending motions. (Doc. Nos. 116, 117, 118, 119.) Accordingly, the Court **GRANTS** summary judgment in Defendants' favor on all of Plaintiffs' claims: (1) breach of contract; (2) breach of fiduciary duty; (3) aiding and abetting breach of fiduciary duty; (4) violation of UCL "unfair" prong; (5) RICO violation; (6) conspiracy to violate RICO; and (7) unjust enrichment. The Clerk of Court is directed to enter judgment accordingly and close this case.

**IT IS SO ORDERED**.

Dated: July 21, 2025

Hon. Anthony J. Battaglia
United States District Judge